EXECUTORS AND ADMINISTRATORS—COMPENSATION—EXTRA SERVICES.

Where an executor, merely at the request of some of the next of kin, and without any direction in the will, continues the business of testator, and performs services therein as a skilled mechanic, he is entitled to compensation therefor, though the amount exceeds the commissions of the executor, as fixed by statute. In re Hayden's Estate (Sup.) 7 N. Y. Supp. 313; In re Taft's Estate, (Sup.) 8 N. Y. Supp. 282,—distinguished.

Final judicial settlement of the accounts of John H. Braunsdorf, as sole surviving executor of the will of Julius E. Braunsdorf, deceased.

Garret Z. Snider, for executor.
I. Newton Williams, for contestants.
A. X. Fallon, for special guardian.

TOMPKINS, S. Julius E. Braunsdorf died at Pearl River, Rockland county, N. Y., on the 30th day of August, 1880, leaving a will by which his widow (Julia Braunsdorf) and John H. Braunsdorf were made executrix and executor. Julia Braunsdorf died on the 13th day of June, 1891. By his will the testator devised and bequeathed all his estate, real and personal, to his executors in trust, "to have the custody, care, and management thereof, and to collect and receive the rents, income, and profits thereof, and pay all necessary expenses and charges for the proper care and preservation thereof, and, after the payment of such charges and expenses, to pay over, on the first day of December of each year, from such net income, to my mother, Henrietta W. Braunsdorf, the sum of three hundred dollars, during her natural life." All the remainder of said income was given to his widow, for her maintenance and use so long as she should remain his widow, and after the death of the widow to his children; one of his daughters, Wilhelmina, however, to receive only the income of her share. The mother died prior to the death of the widow. The

surviving executor, John H. Braunsdorf, now makes and renders an account of his proceedings as sole surviving executor. At the time of the death of the testator the widow was occupying the homestead farm, at Pearl River; and living with her were several of the testator's children, then under age, and some of them quite young. At the time of the testator's death, and for some time prior thereto, he was engaged in the manufacture of machinery, and occupied a factory for that purpose at Pearl River. At the time of his death there was a large quantity of goods and material which had not been made up, and which were of little, if any, value in that condition. It is substantially conceded that the stock and merchandise in the factory at the time of the testator's death, in process of manufacture, were valueless, except as junk, unless made up. For some years prior to the death of the testator, John H. Braunsdorf, the executor and the testator's eldest son, had been in his father's employ as a machinest in this factory. After the death of the testator, the executor, John H. Braunsdorf, with the consent of the widow and all of the children, continued the business until the widow's death, in June, 1891. For a short time he employed a number of hands in the factory, in making up the unmanufactured stock and completing unfinished machinery, and in filling unfulfilled contracts and orders. Some of the executor's brothers worked in the factory with him after their father's death, and received wages from the executor. It was at the request of the widow and William Braunsdorf, who was then of age, and other children, who are contestants in this proceeding, that the executor, John H. Braunsdorf, continued the manufacturing business. The will did not require or provide for a continuance of the business by the executor. The testimony of the executor, which is uncontradicted, shows that it took seven or eight years to make up and complete the machinery, of which certain parts were in stock at the time of the testator's death. This he did, and during the early part of the time he had a number of persons employed in the factory; he himself acting as superintendent and working, and devoting all of his time to the business, as a skilled machinist. Afterwards, and during the greater part of the time, he had but one or two persons, besides himself, working in the factory. Immediately after the testator's death it was agreed between the widow and the children who were of full age that the executor should continue to receive the sum of $18 per week for his services as a machinist in the factory, that being the amount which he had received from his father during his lifetime. After about a year, and the orders which had not been filled at the time of the testator's death were completed, William Braunsdorf suggested that, for the further services of the executor in making up the unfinished parts of machines then in stock, he should receive the sum of $12 per week, instead of $18 per week. This was agreed to, and the executor continued the business, down to the death of the widow, without any objection on the part of any of the children, who had in the meantime all become of age. From the time of the testator's death the net income of this manufacturing business was paid by the executor to the widow, and was used by

her in the support of herself and children upon the farm. In the account the executor charges himself with the amount of the inventory, to wit, $21,953.09, and with the sum of $9,467.43, increase over inventory; also, with $5,450.31, being amounts received from sale of property and collection of accounts not inventoried, which amount also includes the net profit of the manufacturing business carried on by the executor as aforesaid.

The first objection made by the contestants is that the account should be surcharged with the sum of $7,344, being the amount retained by the executor for wages, out of the proceeds of the manufacturing business, during the time he carried it on as aforesaid. The executor, by his account, gives no items of the manufacturing business; nor does his account show that he paid himself anything for the services thus rendered, but shows simply a net profit of $2,289.35. The contestants, by their examination of the executor, have shown that, out of the gross receipts of the manufacturing business, the executor has retained the sum of $7,344,—being at the rate of $18 for the first year, and $12 per week thereafter; and the contestants now seek to charge the executor with that amount, on the ground that he is not entitled, for whatever services he may have rendered, to more than the commissions allowed by law. I am of the opinion that the account should not be so surcharged. The will did not require the executor to continue the business. He did it on his own responsibility, and, if there had been losses to the estate by reason thereof, he would have been personally liable. He is chargeable with all the profits. The business was profitable, and he charges himself therewith. In Munzor's Estate, 4 Misc. Rep. 374, 25 N. Y. Supp. 818, it was held:

"Where an administrator continues the business of his intestate, it becomes his individual business, though the estate is entitled to the profits; and therefore the administrator, on accounting, need not state the details of the business, or produce vouchers for the disbursements thereof."

On the question of the executor's liability for the wages retained by him, I find the facts to be as follows: The testator had carried on the business of manufacturing machines for some years before his death, and from the income thereof supporting his family. The executor worked for him as a skilled machinist, receiving for his services $18 per week. Upon the death of the testator there were a lot of unfinished machines in the factory, and a large lot of material in course of manufacture, and a lot of unfilled orders for complete machines. The widow, with five of the minor children, continued to live upon the farm near the factory. There was but little property from which any income could be derived for their support but the factory. It was agreed between the widow and William Braunsdorf and Mrs. Deckelman, children who were of full age, and Henry Braunsdorf, who was about 18 years of age, that the executor should continue with the business, supplying the unfilled orders, and completing the unfinished machinery, and that he should receive the same wages paid to him by his father, to wit, $18 per week. The executor continued the business for about a year, paying the net in-

come to the widow, who, in part, supported herself and children therewith. During that time two of the other children worked in the factory, and received their wages from the executor, and thus the business was carried on for about a year. Then it was suggested by William that, inasmuch as most of the large orders had been filled, $12 per week would be sufficient compensation for the executor, which was agreed to; and from that time until the widow's death, in June, 1891, the business was carried on by the executor, he also doing outside jobbing, etc., and paying all the net income to the widow. After the children grew up and left the old home, they frequently returned, and in the summer lived for weeks and months at a time with the mother, without paying board, the expenses of the household being met in part by the receipts from the factory. At one time William said to the executor: "John, we cannot do without you. You keep right on. We want your help to sell the goods," etc. Several letters from William to the executor were put in evidence, in which William commended John's work and services, and cautioned him against overworking himself. The executor was a skilled mechanic, and remained there in the factory, working for his mother and brothers and sisters, at less wages than he might have earned elsewhere, while his brothers went off to the city of New York, as they grew up, and entered into various occupations. These same brothers and sisters now insist that the executor shall repay to the estate the wages which he retained for those 11 years' work. For six years after the testator's death, George, Julius, Laura, Julia, and Henry were at the homestead, and were supported partly by the proceeds from the factory. The executor acted as manager of the business, as well as performing the work of a skilled mechanic. The rule is well settled that an executor can receive no greater compensation for his own services than the commissions fixed by statute. In re Hayden's Estate (Sup.) 7 N. Y. Supp. 313; In re Taft's Estate (Sup.) 8 N. Y. Supp. 282; Collier v. Munn, 41 N. Y. 144. This case is, however, distinguishable from the cases cited, in several particulars. Here the will did not direct the executor to continue to carry on the business. He did it on his own responsibility, and at the request of some of the contestants. The duties performed by him as a skilled mechanic were not in the line of his duty as executor, and were not imposed upon him by the will, nor by law. In all of the cases cited by counsel for the contestants, the duties for which extra compensation was sought were executorial in their character. The services rendered by this executor were of such a character as an executor could not be required to render, and could not perform without the mechanical skill and training which this executor possessed. The case most parallel is the case of Lent v. Howard, 89 N. Y. 169, in which it was held that an executor who managed a farm, in respect to which he owed no duty under the will, was entitled to receive out of the proceeds a reasonable compensation in addition to legal commissions. There being no claim of waste or neglect by the executor in the management of this estate, or the conduct of the factory business, he is only chargeable with the net profit, as shown by Schedule B of the account.

The executor credits himself with the sum of $8,715, paid to the widow as income, pursuant to the provisions of the will. This item is objected to, and it is claimed that the actual net income to which the widow was entitled amounted to but the sum of $356.76, and that the above item should be disallowed, to the extent of $8,358.30. At the time of testator's death he owned considerable real estate, including a large brick factory, upon which there was a mortgage of $10,500. By the account it appears that the executor is chargeable with personal estate aggregating the sum of $30,089.72, including the profit earned by the executor in the factory. Substantially all of this was used in the payment of the funeral expenses, expenses of the administration of the estate, and debts, including the mortgage for $10,500. In fact, it appears that the executor and executrix mingled the personal and real estate, using the personal estate for the benefit of the real, and using the rents of the real estate for the support of the widow and family, and payment of debts and expenses; it having been necessary so to do in order to keep the family together, support them, and preserve the estate. There is no claim, and certainly no proof, that the executor acted other than in good faith, and for the best results. It is impossible, on this accounting, to entirely separate the personal and real. It is conceded, however, that substantially all of the personal estate, to wit, $30,089.72, was used in the payment of debts and expenses. The gross income of the real estate, down to June, 1891, the date of the widow's death, was the sum of $14,284.21. The executor paid out of the rents, for insurance and taxes, the sum of $7,863.51; leaving the sum of $6,420.70, being the net income, if no other deductions are to be made.

It is contended, however, by the contestants, that the sum of $5,764.14, paid by the executor for repairs, should be deducted from the income. I think not. These repairs were made for the permanent improvement of the real estate, and enhanced its value; and in the partition and sale of the real estate (the judgment in which action is in evidence) all the parties to this proceeding were benefited, to the extent to which these repairs enhanced the property. Under the circumstances, I think that these repairs should be charged against the principal, and not against the income. If the income had been forced to pay for all of the repairs and improvements to the real estate, there would have been no income for the widow. It was certainly the intention of the testator that the widow should have the income, and it was evidently his intention that there should be some income for her support and maintenance; and it having been paid to her, and used by her for her own support, and the support of the contestants while with her, it should not now, in justice or equity, be disallowed.

The above amount of $6,420.70, plus the sum of $37.26 (being the surplus of the personal estate after the payment of all the debts, etc.), making in all the sum of $6,457.96, I find to be the total net income of the estate, out of which the executor paid $300 to the testator's mother, pursuant to the will; and the balance of $6,157.96, then, was

income, to which the widow was entitled. This amount, deducted from $8,715.06 paid to her, leaves the sum of $2,557.10, with which the executor should be charged, in addition to the amounts charged against him by his account, unless it is shown that these amounts have been paid to the contestants. It is claimed on behalf of the executor that it appears that these contestants have received their respective shares of this difference. It appears that most of them lived with the mother for several years; that all of them visited there frequently, and remained during the summer vacations, etc. But there is not sufficient proof to create legal liability upon their part. Morally and fairly, not one of them should seek to charge the executor with this difference; but they insist upon the objection, and I must find—reluctantly, however—that the executor is chargeable with this amount of $2,557.10.

The next question to be considered is whether the executor should be charged with the sum of $7,448.64, which is claimed to be the difference between the total receipts from the sale of real estate and the total amount paid to the children out of such receipts. The will gave the executors power to sell. The executor sold certain premises, from 1880 to 1892, for the aggregate sum of $23,448.64. Each of the children received various amounts out of these proceeds. The balance was used for the payment of taxes, insurance, etc., and the whole amount is accounted for by the account. It makes little difference where the money came from with which these items were paid. They had to be paid, and it matters little to the contestants from what source the moneys came, so long as none of the proceeds were used for an improper use. If proceeds of the real estate were used to pay debts, etc., these contestants received their respective shares of the personal estate, which otherwise would have been used for the same purpose.

The executor asks credit for the sum of $1,285.77, paid for the erection of a frame factory. It seems that in 1881, not needing so much room, the executor rented the large factory for $1,000 per year, and he moved the manufacturing business into a small new frame building, which he had erected at a cost of $1,285.77. It appears that it was necessary for the storing of the estate's property, and for the carrying on of the business, and that it enabled the executor to rent the large factory at a good rental. The new building, however, was started in January, 1881, for the purpose of providing a place for the sale of the goods of the estate. The executor testifies that it was necessary, and that no other place could be gotten, and when the large factory was rented for $1,000 a year the executor moved his manufacturing business into it. On the sale of the premises in the partition suit, this frame factory and the lot upon which it stood sold for $1,950, and it was shown that the lot was worth from $300 to $500; and each of these contestants received his share of the proceeds, with knowledge of the cause of increase in value. So that it is clear that the building of this factory was in every respect a benefit to the estate and these contestants, and the only question now is, did the executor have the power to expend the estate moneys for

that purpose? The will imposed the duty of caring for and preserving the estate. It took several years to dispose of the peculiar stock and machinery of the business in which the testator was engaged, and the executor testified that it was necessary to have some place in which to store and sell these goods. Was it not within the powers of the executor to provide a place, with the assets of the estate, for the care and preservation of estate property? However, the claim should be allowed for the reason that the contestants have all reaped the benefit of these improvements, and received their respective shares of the increased price for which the property sold in the partition suit, and are now estopped from questioning the right or duty of the executor to erect the building. In the case of Rose v. Rose, 6 Dem. Sur. 26, the executor, without authority, with assets of the estate, erected a house upon land of the estate, which afterwards was accepted by the beneficiaries, and sold at a loss, they receiving and retaining the proceeds, and it was held by the surrogate of Westchester county that their act amounted to a ratification of the investment, and discharged the executor from liability for the loss. Here the sale of the premises by these contestants, and the acceptance of the proceeds, which were increased by the act of the executor, constituted a ratification of his act in building, even if it was unauthorized.

As to the payments made to the children and contestants, they are all allowed. They are all established by the testimony of the contestants themselves. Those who were under age at the time payments were made have testified that the amounts were received and have been retained, and thereby the payments have been ratified.

Objection is made to the payment of income to the widow on the ground that sufficient vouchers have not been produced. There is sufficient competent evidence to establish these payments. Further, the widow is dead, and no claim is made on behalf of her estate. These contestants have no interest in that income as devisees of Julius E. Braunsdorf.

Let a decree be submitted, upon two days' notice, for settlement, at which time my attention may be called to any errors in respect to the testimony or the figures. Costs to all parties out of the estate. Ordered accordingly.