---

(79 App. Div. 296.)

## In re PECK.

(Supreme Court, Appellate Division, Third Department. January 14, 1903.)

1. EXECUTORS AND ADMINISTRATORS—CONTINUANCE OF BUSINESS—ACCOUNTING.
    Where an executor was not required by the will to continue the testator's business, but did so of his own motion, he is only required to account for the actual net profits made in the business during such continuance, and therefore the expenses paid by him for salaries, etc., cannot be reviewed by the surrogate on such accounting.

2. SAME—SALARY TO EXECUTOR.
    The executor, under such circumstances, was not entitled to deduct from the gross receipts of the business a salary for his own services, since he was not entitled to deal with the trust property for his own advantage.

3. SAME—CLAIMS CREDITED BY EXECUTOR—BURDEN OF PROOF.
    The burden of proving the justice and necessity of payments made on a claim created by an executor is on him.

4. SAME—COUNSEL FEES.
    Where a sum of $650 has been allowed to an executor for counsel fees paid to a firm of attorneys, it was error to allow the executor a further sum of $500 for attorney's fees paid to another firm, where the only proof of service rendered by such firm was the executor's general statement that it was for advice given.

5. SAME—PERFORMANCE OF LEASE—PAYMENT OF RENT.
    Where an executor was obliged to pay the full sum of $375 on an outstanding lease held by deceased for the unexpired term, and received from subletting the property the sum of $225, and there was no evidence that he could have obtained more, he was properly credited with the difference of $150.

6. SAME—WILLS—CONSTRUCTION.
    A testator, by a codicil to his will, bequeathed certain legacies in the event that he survived his wife, payable out of the capital employed in his business, and the proceeds of sales of machinery, molds, patents, and good will of the business. A similar bequest to the same persons was contained in a codicil to the will of his wife, executed at the same time and place, in the event she survived her husband, to be payable out of the capital employed in the husband's business, and the proceeds of the sale of machinery, etc. Prior to the execution of such codicils, the wife had loaned her husband, to be invested in the business, over $9,000, and on the settlement of the husband's estate after the wife's death it was determined that the amount of the capital employed therein was $21,-119.84, and that the outstanding debts amounted to $6,416.99. Held, that the amount loaned by the wife was not a debt of the firm, to be deducted from such balance in determining the amount from which such legacies were payable.

Appeal from surrogate's court, Essex county.

Judicial accounting by George W. Peck, as executor of the last wills of George W. Banker and Henrietta M. Banker, deceased. From a surrogate's decree settling the accounts and disallowing exceptions filed by certain of the heirs, they appeal. Modified.

Argued before PARKER, P. J., and SMITH, KELLOGG, CHASE, and CHESTER, JJ.

Foley & Powell (James C. Foley, of counsel), for appellants Bert A. Banker and others.

Gustave Hurlimann, for appellants William Banker and another.

A. K. Dudley and Richard Lockhart Hand, for respondent George W. Peck.

. Philip Carpenter, for respondent National Woman's Suffrage Ass'n.

Milo C. Perry, for respondent town of Keene.

PARKER, P. J. This record presents two appeals,—one from the decree of the surrogate of Essex county, finally settling the accounts of·George W. Peck as executor of the will of George W. Banker, deceased; the other an appeal from a decree made by the same surrogate upon the judicial settlement of said Peck's accounts as executor ˙of the will of Henrietta Banker, deceased. The said Henrietta was the widow of the said George W. Banker, and she died on the 5th day of December, 1899. He died on November 23, 1899. The will of George W. Banker left all his property to his wife, Henrietta. No party had any interest in the settlement of his estate save his said wife and his creditors. By her will she gave all her property to her husband, but, in the event that she survived him, her estate passed to certain legatees therein named. Some of these legatees filed objections to the accounts of said Peck, as rendered by him, in both estates. The surrogate sustained some of those objections and denied others, and from the decision so made in each proceeding both the contestants and said Peck have appealed to this court.

We can consider upon this appeal those questions only which were raised by the surrogate's rulings upon the objections taken. The most serious one arises under the following conditions: At the time he died, Banker was engaged in the business of dealing in certain merchandise under patents owned by himself. Peck and his son, Oscar, had for some years been in his employ, and were skilled in carrying on such business. During the two-weeks interval between Banker's death and that of her own, his wife, Henrietta, who was the executor named in his will, and who alone took his whole estate as the absolute owner thereof, entered into a copartnership agreement with Peck, under which they were to continue the business that Banker had left. Upon her sudden death, and after he was appointed executor of both estates, the scheme of a partnership seems to have been abandoned, and he concluded to continue the business himself until a purchaser could be found for it upon what he considered would be favorable terms. He was then informed by his counsel that, if he did so, he would be liable to account and make good to the estate for any loss that might occur to the assets thereof, and that, as to any profits that he might make, they must be deemed the property of such estate, and accounted for as assets thereof. He continued the business something over a year in the store

for which the estate then held an unexpired lease, and upon his accounting to the surrogate as executor of George W. Banker's estate he charged himself with the sum of $2,764.31 as the net profits made by him in so conducting the business. The contestants objected to this item as insufficient, and upon the hearing before the surrogate it appeared that among the items of expenses which Peck credited to himself in ascertaining the net profits he included a sum of $2,371.53 paid to his son for services as an assistant therein, and also the sum of $3,071.95, taken by himself as compensation for his services in so conducting the business. As to the payment to the son, the surrogate reduced the sum so claimed to $1,769.58. As to the credit for his own services, the contestants claim that Peck was not entitled to any. The surrogate allowed him his whole claim, and here is presented the question for consideration.

It is clear that Peck was not acting as executor in continuing this business. He was not required by the will so to do, but individually, and of his own motion, he continued it for something more than a year before he sold the same as assets of the Banker estate. He was, therefore, under no obligations to account to the surrogate for the details of such business. His receipts and expenditures in such business were no part of his executor's account. He was obligated to report and account to the surrogate for the actual net profits made in such business, because, under the well-settled and familiar rule of equity, such profits became an asset of the estate; but he was in no way responsible to the surrogate, nor to the estate, for not having made more. His primary liability was for all the assets of the estate, and for such profits as he actually made from them, not for what he might have made had he managed the business more economically, and with greater discretion. And the burden is upon the beneficiaries to show that the net profits were more than the executor reports. If they fail to show that he made any profits, and he reports none, but yet show that he used the trust fund in his own business, they may have interest thereon because of his wrongful use of the same. These principles are well stated by Ransom, S., in the Munzor Case, 4 Misc. 374, 25 N. Y. Supp. 818. It seems clear, therefore, that the amount which Peck paid to his son for assisting him in carrying on this business was not a proper subject of inquiry before the surrogate. True, he might have made more profits if he had not paid so high salaries to his help, but, as stated above, he cannot be surcharged by the surrogate for not making larger profits. He was under no obligation to the estate to make any, and hence the only inquiry before the surrogate was whether he accounted as executor for all that he did make. There is no pretense that he had not actually paid to his son the full amount of $2,371.53; no claim that he had it still in his hands, and was seeking to appropriate it to his own use in this indirect way. Hence it was not within the scope of the inquiry before the surrogate, and the surrogate was in error to surcharge the executor's account with any part thereof.

As to that part of the earnings of the business retained by the executor on account of his own services, a different question is presented. Confessedly, he has not paid out any part of it. It can hardly be said

to have been disbursed. It is still in his hands as a part of such earnings. It is a well-settled rule of equity that a trustee is not permitted to deal with the trust property so as to gain any advantage, directly or indirectly, for himself, beyond his lawful compensation. He may not use it in his own private business. He may not make any individual profits for himself in its management, and he may not acquire any pecuniary gains from his fiduciary position. The beneficiary is entitled to claim all advantages actually gained, and to hold the trustee chargeable for all losses, if any, happening from a violation of his duty. Pom. Eq. Jur. § 1075. Within this rule, I am unable to see upon what theory Peck may withhold from the estate of which he is executor any portion of such earnings to his own use or benefit. If the amount of his receipts from the business just equaled the amount of his disbursements, clearly Peck could not ask that he be paid from the estate a reasonable sum as compensation for his services. If the amount of his receipts exceeded his disbursements by the sum of $3,071.95, why should he be allowed to retain that as such a compensation? The estate owes him nothing for his services, but may, under the rules of equity, demand from him everything that he—that is, his labor and skill—has succeeded in clearing up out of the business. And such demand is imposed against him for his wrongful act in using the funds of the estate in a manner forbidden by law. Neither the case of Lent v. Howard, 89 N. Y. 169, nor any of those to which we are cited by the counsel for the executor, are in conflict with this conclusion; nor have I been able to find any decision that is. The question here presented is not whether an executor acting for the estate under circumstances which require unusual and greatly increased labors, may have a greater compensation than the statute allows him, but whether the above-stated rule of equity will permit a trustee to retain to himself a salary from earnings which he has made through an unlawful use of the trust property. I am of the opinion that he may not do so, and that the net receipts which Peck should have accounted to the surrogate for should have included the earnings which he claimed to retain as salary for himself. It is manifest that Peck's continuing the business has worked a decided advantage to the estate, and that he entered upon such work in order that the estate might be so advantaged; and it seems to be an ungracious objection on the part of the beneficiaries that will deprive him of all compensation for services that have so resulted. But it is presented to us as a question of law merely, and we may not swerve from well-established, and, in their general application, just and equitable, principles, because in this case it seems to impose a hardship upon the trustee for a well intended act.

A further objection to the account assails the amount of attorney's fees and counsel fees which the executor asks to be allowed. From the beginning an attorney seems to have been employed by the executor, and also another firm as counsel; the two acting in each estate. On a final accounting an unassailed voucher for the payment of the debt of a deceased throws upon the contestant the burden of impeaching the justice, as well as the fact of the payment, of the claim. But the burden of proving the justice and necessity of a payment made upon a claim created by the executor rests upon him, and hence it devolved

upon Peck to establish the justice of the payments in this regard, for
which he asks to be allowed. In re Hosford, 27 App. Div. 427, 50
N. Y. Supp. 550. In the estate of George W. Banker, I am not dis-
posed to interfere with the conclusions reached by the surrogate re-
specting such claims, except as to three items hereinafter referred to.
The claim for attorney's fees was largely cut down, and, I think, cor-
rectly. In the other estate I am of the opinion that the allowance
for attorney's fees should be further reduced by the sum of $500. The
burden was upon Peck to show what services were rendered in con-
sideration for that sum so allowed him. It should be made to appear
that they were necessarily incurred in the business of the estate.
There is a total absence of proof that services as an attorney were
rendered therefor, except the general statement that they were for
advice, etc. But there is allowed to the executor in this estate the
sum of $650 as counsel fees paid to another firm. This sum I see
no reason to reject. The surrogate may well, from the facts ap-
pearing before him, have concluded that it was a necessary and rea-
sonable sum to pay; but there are certainly no facts which show
that, in addition thereto, services as counsel were needed from the
attorney to the extent of $500. The sum of $641.27 allowed as at-
torney's fees, in addition to the $500, is possibly sustained by proof
of its necessity, but the $500 is not sustained by any proof, and should
not have been allowed.

There are three several items, viz., Geo. B. Glover, $50, F. B. Cand-
ler, $37.50, and W. E. Stiger, $25, for which the executor claims to
be allowed in the George W. Banker estate; and the following, W.
E. Stiger, $37.50, E. L. Winthrope, $50, and F. B. Candler, $37.50,
in the other estate. Neither of them is warranted as counsel or at-
torney's fees. There is no evidence to show that they rendered any
such services to the estate. Within the above-stated rule, they should
have been disallowed.

As to the other disbursements for which the executor asks to be
allowed in each of the estates, and to which objection is made, there
is no serious claim that they were not actually paid. But many of
them seem very large, and as to some there is very slight, if any,
proof that they were necessarily incurred. All such items, however,
are to some extent supported by some proof, and whether reasonable
or not depends very largely upon matters of fact, which the surrogate
was better situated to pass upon than we are upon the record before
us. I consider them purely as questions of fact. The conditions
surrounding this case are peculiar to it. The executor very clearly
had to meet many perplexing questions; not only legal ones, but as
to what was the most judicious way in which to care for and sell the
property which came to his hands. And the surrogate's disposition
of these questions I am not disposed to interfere with.

As to the objection that the sale of the business and property
employed therein of George W. Banker at private sale was for a much
less sum than it was fairly worth, it does not appear that any facts
were furnished the surrogate upon which he could charge the execu-
tor's account with any other sum. The suggestion that the pur-
chase was in the interest of Peck himself is utterly unproven, and
I see no error in the surrogate's decree in this respect.

The claim of the executor that the surrogate erroneously disallowed him an item of $150, payment on account of rent due on a lease outstanding at the time of George W. Banker's death, is correct. He was obliged to pay, as a debt of Banker's, due on that lease, the full sum of $375 up to April 30, 1901. He was able to sublet the premises for the sum of $225 only. There is no evidence that he could have obtained any more. The balance of $150 was evidently a payment which he was obliged to make, and for which he should have been allowed.

There is another question presented by the contestants, which we are called upon to determine. By the codicil to his last will George W. Banker, in the event that he survived his wife, gave to several persons named therein certain money legacies, amounting in all to the sum of $8,500, "out of the capital employed in my business and the proceeds of sales of machinery, molds, patents, and good will of the business"; and the balance, if any, he gave one-half to the National Woman's Suffrage Association, and the other half to the town of Keene in Essex county. A similar bequest to the same persons was contained in a codicil to the will of his wife, in the event she survived him, executed at the same time and place. The fund from which such legacies are to be paid, as described in her codicil, is "out of the capital employed in my husband's business and proceeds of the sale of machinery, molds, patents, and good will of the business." Some years prior to the execution of such codicils, the wife had, from time to time, loaned to her husband money for the purpose of being invested in such business, and at the time of his death it was so employed, and amounted to $9,369.67. The surrogate finds that the cash and such machinery, molds, and patents constituted the capital employed in the husband's business, and that it amounted to $21,-119.84; that there were outstanding debts on account of the business to the amount of $6,416.99, leaving a balance of $14,702.85, from which balance the legacies given by such codicil were properly paid by the executor. The contestants claim that said sum of $9,369.67, which had been loaned by the wife to the husband, was a debt due from him to her, and should have been deducted from the $21,119.84, as was the $6,416.99, and that the balance of $5,333.18, only, constituted the capital employed in the husband's business within the meaning of the codicil to the wife's will. If such construction is correct, then the $9,369.67 was no part of the fund from which the legacies given by that codicil could be paid, but it should have been distributed to the legatees named in the will. I am of the opinion that the construction adopted by the surrogate was the correct one. Both husband and wife evidently used the word "capital" in the sense of money or property, and their joint scheme was to dispose of the property which they jointly had put into the business. It is inconsistent with their evident purpose to conclude that the capital referred to in the wife's codicil was $9,369.67 less than that referred to in the husband's codicil. If he survived his wife, and then died, both knew that the $9,369.67 would have become his, and so, beyond all controversy, become a part of the capital invested. Is it credible that she intended, in the event that she survived him, and then died, that

the $9,369.67 must be withdrawn from the fund which was to pay the legacies provided for in the codicil of each? Clearly not. The intention is ·plain, and effect must be given to that intention. In this respect the decree of the surrogate must be affirmed.

It is complained that the surrogate ·erred in holding that upon the husband's death all this business and property passed at once to the wife, and must be administered by Peck as her property. In my judgment, it matters little whether that view is or is not correct. If erroneous, the interests of the contestants are in no way affected thereby. Whether treated as the property of the husband or of the wife, the fund in question, under the above views, would be applicable to the payment of the legacies named in the codicils, and so the same result would follow.

The decree of the surrogate should be modified in each case in accordance with the suggestions herein contained, and the executor's commissions should be adjusted accordingly, and, as so modified, affirmed, with costs of appeal to the executor, to the contestants, and to the guardian ad litem, payable out of the estate. But one bill of costs to each of such parties should be allowed for the two appeals. All concur.