**1.** EXECUTORS AND ADMINISTRATORS (§ 93*)—MANAGEMENT OF ESTATE—AU-
THORITY.

Where a will contains no provision authorizing the executors to con-
tinue the brick-manufacturing business of testator, the executor had no
such authority, though the property was such that it could be used to
better advantage in that way.

[Ed. Note.—For other cases, see Executors and Administrators, Cent.
Dig. §§ 407, 408; Dec. Dig. § 93.*]

**2.** COURTS (§ 200¼*)—SURROGATE'S COURT—EQUITABLE JURISDICTION.

A Surrogate's Court may apply equitable principles to subject-matters
within its jurisdiction, though it does not possess general equitable juris-
diction.

[Ed. Note.—For other cases, see Courts, Cent. Dig. §§ 476, 477; Dec.
Dig. § 200¼.*]

**3.** COURTS (§ 200¼*)—SURROGATE'S COURT—EQUITABLE JURISDICTION.

Where executors had the net proceeds of business conducted by them
without authority under the will, for which it was their duty to account,
and they invested them in real estate, the title to which was taken in
the name of one of the executors, and held by him for the benefit of the
estate, the Surrogate's Court has jurisdiction to determine whether, as
between the beneficiaries or those claiming under them, the property re-
mained such, as the duties of the executors in reference thereto were the
same as if they had received it directly as a part of the estate.

[Ed. Note.—For other cases, see Courts, Cent. Dig. §§ 476, 477; Dec.
Dig. § 200¼.*]

**4.** EXECUTORS AND ADMINISTRATORS (§ 497*)—COMPENSATION—CONDUCT OF
BUSINESS.

An executor, who continues the business of his testator without au-
thority, or uses the property in a new business, and continues it, renders
no service to the estate which entitles him to compensation, independent
of his right to statutory commissions, in the absence of an agreement
between the beneficiaries of the testator and the executor that he was
to be paid for such services.

[Ed. Note.—For other cases, see Executors and Administrators, Cent.
Dig. §§ 2117–2124; Dec. Dig. § 497.*]

**5.** EXECUTORS AND ADMINISTRATORS (§ 497*)—COMPENSATION—CONDUCT OF
BUSINESS.

The acceptance by the beneficiaries under a will from time to time
of the net profits of the testator's business, carried on without authority
by the executor, does not imply an agreement by them to pay the execu-
tors for the services rendered.

[Ed. Note.—For other cases, see Executors and Administrators, Cent.
Dig. §§ 2117–2124; Dec. Dig. § 497.*]

**6.** EXECUTORS AND ADMINISTRATORS (§ 497*)—COMPENSATION—SUPERINTEND-
ING REAL PROPERTY.

Services rendered by executors in renting, collecting rents of, and su-
perintending real property, so far as they are given in accordance with
the will, do not entitle the executors to extra compensation.

[Ed. Note.—For other cases, see Executors and Administrators, Cent.
Dig. §§ 2117–2124; Dec. Dig. § 497.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Judicial settlement of the accounts of George Archer, as sole surviving executor and trustee under the will of Michael A. Archer. Decree entered.

Frederick W. Penny, of Haverstraw, for executor and trustee.

Harvey De Baun, of Congers, for Margaret Archer and special guardian for infant parties.

GAGAN, A. S. This is a proceeding upon an accounting by George Archer as sole surviving executor of and trustee under the last will and testament of Michael A. Archer, from January 11, 1889, to December 15, 1900.

The last will and testament of Michael A. Archer was probated in the Surrogate's Court of the county of Rockland on the 12th day of October, 1881. Letters testamentary were on that date granted to Charles D. Archer and Allison M. Archer, and letters testamentary were thereafter granted to George Archer upon his attaining full age; he having been a minor at the time the will was probated. George S. Sherwood, who was nominated in the will as executor, never qualified. On July 25, 1888, the letters testamentary granted to Allison M. Archer were revoked by a decree of the Surrogate's Court of said county of Rockland and he died on the 20th day of July, 1892. Charles D. Archer acted as executor, together with George Archer, until his death on the 17th day of October, 1909.

The will of Michael A. Archer, as far as it is pertinent to this proceeding, is as follows:

"I, Michael A. Archer, of the town of Haverstraw, Rockland county, do make, publish and declare this to be my last will and testament in manner and form following, that is to say, I give, devise and bequeath all my property, real and personal to my executors hereinafter named in trust to receive the rents, issues and profits thereof for and during the lifetime of my wife Clarissa A. Archer, and apply the same to the use of the following persons, as follows: Pay the one-third thereof to my said wife during her lifetime and the other two-thirds thereof to my three sons, Allison M. Archer, Charles D. Archer and George Archer, in equal proportions during the same time.

"Should my sons Charles and George and my said wife desire to continue to reside in my dwelling house where I now reside, then my will is that they may occupy my said dwelling house and the lot and barn used therewith and the furniture and property in the house and barn so long as they desire so to do without paying any rent therefor during the lifetime of my said wife, each paying one-third of the actual living expenses of the household. Should my son Allison desire to reside where he now does, my will is that he may do so without paying any rent during the lifetime of my said wife.

"At the death of my said wife, I order and direct my said executors to sell and dispose of my property as soon as they may deem it wise and expedient so to do, and divide the proceeds thereof equally between my said three sons, unless they elect then to hold the same; but if they elect and desire to hold the same together then the same shall be conveyed to them by the said executors instead of being sold.

"I authorize and empower my said executors to pay to my said wife a sum in gross, in lieu of the income from my said property at any time they desire so to do, or to invest one-third of the proceeds of any sale made by them of any of my property and pay the interest thereof to her during her lifetime.

"I empower my executors to sell and convey my property, real and personal.

"Should, my three sons and my wife desire my son Allison and his family to reside with them, where I now reside, then my will is that he may do so as long as they desire. The provisions herein made for my said wife are in lieu of her right of dower in my property."

The testator died seised and possessed in fee simple of certain real property situate in the town of Haverstraw, in the county of Rockland, a part of which was suitable for brick-making purposes, and upon which at the time of his death he conducted a brick-manufacturing business. After the testator's death his executors, as such, continued the brick-manufacturing business in which he had been engaged and used the real property of which he died seised for that purpose. During a number of years covered by this accounting this brick-manufacturing business was continued by Charles D. Archer and George Archer, as such executors, and said real property was devoted to that use.

While the three executors were acting as such, they purchased several parcels of real estate, situated in the town of Haverstraw, and the title thereto was taken in the name of George Archer, individually, with the understanding that he was to hold the same for the benefit of the estate. The three executors, as such, began a brick-manufacturing business upon this newly acquired real property and used it for brick-making purposes, and, for a number of the years over which this accounting extends Charles D. Archer and George Archer, as such executors, were engaged in the brick-manufacturing business thereon, and the real property so acquired by them was utilized in said business.

In carrying on and conducting the brick-manufacturing business of the testator on the real property of which he died seised and also upon the real property subsequently acquired by them, they considered that they were acting as executors and for the benefit of the estate of Michael A. Archer, and in this accounting the sole surviving executor has in form accounted for all the net profits derived from these businesses during the period of this accounting. The accounts, however, have been contested, and objections have been filed thereto by parties claiming under Allison M. Archer, and the only questions of any importance which have not been eliminated by consent are the following:

First. Had the executors authority under the will of the testator to either continue the brick-manufacturing business of the testator upon the real property of which he died seised, or, as executors, to engage in and conduct a new brick-manufacturing business upon the real property subsequently acquired by them, the title to which was taken in the name of George Archer, individually?

Second. As between the beneficiaries under the will of the testator, or those claiming under them, and the excutors, did the personal property, to which the estate or the beneficiaries under the will of the testator, or those claiming under them, were entitled, and which was invested in real property by the executors, retain its characteristics as personal property, and has the Surrogate's Court jurisdiction to determine that question?

Third. Are the executors entitled to extra compensation for the services rendered by them in carrying on such brick-manufacturing business?

Fourth. Are the executors entitled to extra compensation, in addition to their statutory commissions, for the services rendered by them in renting, collecting the rent of, and superintending the real property of the estate generally?

These questions will be discussed in the order in which they appear.

[1] There is no provision in the will of the testator which authorizes the executors, as such, to either continue the brick-manufacturing business of the testator or to engage in a new brick-manufacturing business. The testator manifests no intention to give his executors that authority, and the court has no right to say that, merely because it appears that the property of the testator was such that it could be used to better advantage by permitting the executors to continue his business, or to engage in a new business, such was the intention of the testator.

"The intention of a testator to confer upon an executor power to continue a trade must be found in the direct, explicit, and unequivocal language of the will, or else it will not be deemed to have been conferred." Willis v. Sharp, 113 N. Y. 587, 590, 21 N. E. 705, 706 (4 L. R. A. 493).

The will on this point is clear and unambiguous, and no discussion whatever is necessary to ascertain the testator's intention, which is patent.

It may here be appropriately stated that there is no difference between the executor who continues the business of the testator without authority and the executor who engages in and carries on a new business without authority. In either instance he is contravening the provisions of the will and violating his duty as executor. The same rules of law ought to apply to either of them. Therefore, when herein discussing the conduct of the executors, I will consider their conduct as being in law similar, when conducting the business of the testator as when carrying on the new business commenced by them.

[2, 3] As to the second question: If this court were obliged upon the record and the voluminous account in this proceeding to investigate the myriad of transactions and the various methods and devices of the executors by which they acquired the personal property that was invested by them in real estate, the title to which was taken in the name of George Archer, individually, it is my opinion that the proceeding would be a proper one for a court of equity, and of which the Surrogate's Court would be without jurisdiction to hear and determine; but, upon the record as it stands, it is my opinion that the Surrogate's Court has jurisdiction in the premises.

Here are the conceded facts, as I understand them: The personal property invested by the executors in real estate consisted of net profits which accrued in the brick-manufacturing business that was conducted by the executors. The accounting executor asserts that this business was conducted by them, as executors of the estate of the testator, and that it was his duty to account for the net profits thereof,

and in the first accounting filed by the executors they did account for such profits, and in this proceeding there is a complete accounting for the same. And, further, the accounting executor does not pretend that when he acquired title to the real property in question it was for his individual benefit, and does not now so contend. It is conceded by him that the title thereof was taken in his name because the executors had been advised that they could not take the title as executors; but that he was to hold it for the benefit of the estate, and it was always considered by him to have been in his name for that purpose.

Hence we have this proposition: Where executors had personal property in their hands, being the net profits of business conducted by them without authority under the will and for which net profits it was their duty to account, and they have invested the same in real estate, which they acknowledge they had no right to do, and which real estate is conceded to have been taken in the individual name of one of the executors, and held by him for the benefit of the estate, has the Surrogate's Court jurisdiction to determine whether such personal property, as between the beneficiaries under the will of the testator, or those claiming under them, retained its characteristics as personal property after being so invested in real estate?

It is true, as contended by the executor's attorney, that the Surrogate's Court has not general equitable jurisdiction; but this does not mean that a Surrogate's Court, where it has jurisdiction of the subject-matter, as between the parties properly before it, cannot apply equitable principles. This it frequently does, and I know of no authority which holds a contrary doctrine.

If, in this proceeding, the personal property which was invested by the executors in real estate had been personal property which they received as part of the estate of the testator at the time of his death, there is no doubt that this court would have jurisdiction in the premises, because, as between the parties, such personal property so invested would still be considered personalty, and the Surrogate's Court would regard it as such on an accounting. Matter of Bolton, 20 Misc. Rep. 532, 46 N. Y. Supp. 908, affirmed 37 App. Div. 625, 56 N. Y. Supp. 1105, affirmed 159 N. Y. 129, 53 N. E. 756; Matter of Gilbert, 39 Hun, 61; Lockman v. Reilly, 95 N. Y. 64; Valentine v. Belden, 20 Hun, 537; Matter of Brenneman, 86 Hun, 289, 33 N. Y. Supp. 302; Clark v. Clark, 8 Paige, 152, 35 Am. Dec. 676.

Hence, unless the executors herein, who invested personal property, namely, the net profits of the brick-manufacturing business above referred to, in real estate, were not governed by the same principles in relation to such property as they would have been, had the same come to them directly from the testator as part of his estate, then this court has jurisdiction in the premises. The executors, not having authority under the will to either continue the brick-manufacturing business of the testator or to engage as executors in a new brick-manufacturing business, were bound to account for the net profits derived from these businesses, or, at the option of those entitled thereto (who herein elected to accept the net profits), to refund the amount of the property diverted, with 6 per cent. interest. Matter of Peck, 79 App. Div.

296, 80 N. Y. Supp. 76; affirmed 177 N. Y. 538, 69 N. E. 1129; Matter of United States Mortgage & Trust Co., 114 App. Div. 532, 100 N. Y. Supp. 12; Matter of Munzor, 4 Misc. Rep. 374, 25 N. Y. Supp. 818; Matter of Suess, 37 Misc. Rep. 459, 75 N. Y. Supp. 938.

The fact that they were accountable for the net profits so invested by them, in my opinion, precluded them from having any right to invest the same in real estate. If they could invest that personal property in real estate, upon what principle could they be prevented from reinvesting it in the most fanciful form of speculation? They were obligated to pay the same over to those entitled thereto, and the duty rested upon them not to hazard or risk it in unauthorized investments. The obligations imposed upon them in respect to their accountability were obligations founded upon equitable principles, to violate which they had no more right than they had to violate the express provisions of the testator's will. Therefore it appears to me that when the executors had in their hands net profits made in these businesses, for which they were accountable, and for which they considered themselves to be accountable, their duties in reference to such personal property were the same as if they had received it directly from the testator as a part of his estate, "because, under the well-settled and familiar rule of equity, such profits became an asset of the estate." Matter of Peck, 79 App. Div. 296, 299, 80 N. Y. Supp. 76, 78.

The considerations lead me to the conclusion that the personal property so invested by the executors was illegally invested, and must be considered, as between the parties entitled thereto and the executors, to have retained its characteristics as personal property; and this court, therefore, has jurisdiction in the premises, although the legal title to the real estate so acquired is vested in George Archer, individually. Lockman v. Reilly, 95 N. Y. 64.

[4] The next proposition is as to the right of the executors to compensation, independent of the question as to their right to statutory commissions, for services rendered in carrying on and conducting the above-mentioned brick-manufacturing business. The accounting executor maintains that the estate was benefited by their conducting the business of the testator, even though the will did not authorize them to conduct it, and that the estate was also benefited by their engaging in and conducting the new brick-manufacturing business. This, it is contended, is so because the accounts show that the brick-manufacturing business was extremely profitable, and that most of the profits were from time to time paid to and received by the persons entitled thereto, including the executors, who were beneficiaries under the will.

What was the status of the executors herein while, as executors, they engaged in the business of manufacturing brick? While thus conducting this business, they were not acting for the estate, because that implies authority to act, which authority they did not possess. They were conducting their own business, not the estate's, and, although they were accountable to the estate for the net profits made in such business, they cannot in a legal sense be said to have been benefiting it. If the estate were benefited, it was because the executors violated their duty, and, upon well-recognized equitable principles, the court

will not permit them to profit by their own misconduct. That an executor, continuing the business of his testator without authority, or investing the property of the estate in a business, which he thereafter continues, is not acting for the estate, but for himself, is sustained by authority. Willis v. Sharp, 113 N. Y. 589, 21 N. E. 705, 4 L. R. A. 493; Matter of Peck, 79 App. Div. 296, 80 N. Y. Supp. 76, affirmed 177 N. Y. 538, 69 N. E. 1129; Matter of United States Mortgage & Trust Co., 114 App. Div. 532, 100 N. Y. Supp. 12; Matter of Munzor, 4 Misc. Rep. 374, 25 N. Y. Supp. 818; Matter of Suess, 37 Misc. Rep. 459, 75 N. Y. Supp. 938; Kenyon v. Olney, 15 N. Y. Supp. 416.[1]

An executor who, under a provision in the will authorizing him to continue a business, continues the same, will not be allowed extra compensation as executor for the services rendered by him in that business. Such is the rule laid down in Matter of Popp, 123 App. Div. 2, 107 N. Y. Supp. 277, in which case the court expressly disapproved the cases in the lower courts, which laid down a contrary rule. That being the law, it is difficult to comprehend how an executor, who without authority continues the business of his testator, or without authority uses the property of the estate in a new business and continues the same, is entitled to compensation for the services rendered therein. In Matter of Popp, supra, the executor actually rendered services to the estate which were authorized. The executors herein did not, in contemplation of law, render any service to the estate. Since the law requires an executor, who in pursuance to the testator's authorization has rendered valuable services to the estate, to be denied extra compensation, a fortiori, upon principle, the executors in this proceeding must be denied such compensation.

The question now under consideration was before the court in Matter of Peck, supra, and it was therein explicitly decided that an executor who carried on the business of his testator without authority was not entitled to any compensation for the services that he rendered in so doing, and he could not retain out of the profits of such business compensation for his services rendered therein. In deciding that case the court said:

"It is a well-settled rule of equity that a trustee is not permitted to deal with the trust property so as to gain any advantage, directly or indirectly, for himself, beyond his lawful compensation. He may not use it in his own private business. He may not make any incidental profits for himself in its management, and he may not acquire any pecuniary gains from his fiduciary position. The beneficiary is entitled to claim all advantages actually gained, and to hold the trustee chargeable for all losses, if any, happening from a violation of his duty. Within this rule I am unable to see upon what theory Peck may withhold from the estate of which he is executor any portion of such earnings to his own use or benefit."

No case has been cited in this proceeding, and I have not been able to find a case, that impairs the force of the decision in Matter of Peck, supra, and it appears to me to be a controlling authority.

[1] Reported in full in the New York Supplement; reported as a memorandum decision without opinion in 61 Hun, 618.

The attorney for the accounting executor relies on two cases to establish his contention, namely: Lent v. Howard, 89 N. Y. 169, and Matter of Braunsdorf, 13 Misc. Rep. 666, 35 N. Y. Supp. 298; Id., 2 App. Div. 73, 37 N. Y. Supp. 229.

It ought to be sufficient to state that the case of Lent v. Howard, supra, was expressly referred to in Matter of Peck, supra, as not being in conflict with the doctrine of that case, and the Court of Appeals affirmed that decision, which would not have been done if it were in conflict with the case of Lent v. Howard, supra; and while Matter of Braunsdorf, supra, was not expressly referred to in Matter of Peck, supra, it was decided long prior to that decision, and was by implication mentioned as one of the cases to which the court must have, undoubtedly, been cited, and declared not to be inconsistent with the rule laid down in Matter of Peck, supra.

In Lent v. Howard, supra, the testator gave his executors a power of sale, which was construed to be imperative, over his real property, except one farm, known as the homestead farm, and accompanied the same with a gift of the proceeds of the sale to his wife and daughter, with cross-remainders over. This operated as an equitable conversion of said real estate, and in equity entitled the wife and daughter to the intermediate rents and profits. The legal title to the real estate, except the homestead farm, descended to the testator's heirs, as there was no devise of the same in the will. Hence the heirs were entitled to possession, which followed the legal title, and they had the right in the first instance to receive the rents and profits, although equity would compel them to account for the same.

The testator's wife took a life estate in the homestead farm, with the remainder in fee simple to his daughter, if she survived his wife, and, if not, the wife took a fee simple absolute in the same. The executors were held to have no right whatever to the possession of the real estate, but under the mistaken belief that it was their duty to take possession of the same "by the consent of all the parties in interest" they took possession thereof, and one of the executors operated the farm lands and managed the real estate. The executors were held accountable to the beneficiaries for the rents and profits of the real estate, and the court allowed the executor who operated the farms and managed the real estate a reasonable compensation for his services, independent of his commissions as executor.

The compensation, which the executor was allowed for operating the homestead farm, was based upon his having done so at the request of the testator's wife, who owned the life estate therein, and he was just as much entitled to be paid for the services, so rendered by him, as a stranger to the estate would have been, because his services in that respect had no relation whatever to the estate. When the testator's wife requested the executor to manage the homestead farm, from that fact the law implied a promise that he

would be paid for his services. Hence that phase of the case has no possible bearing upon the question before this court.

The executor who operated the farm lands and managed the real estate does not appear to have violated any of the terms of the will. He did not contravene any of his duties as executor in doing what he did do. He performed services that were no part of his duties as executor. He committed no wrong against the estate. He was acting as an individual, although he believed he was acting as an executor. What he did do was to arrogate to himself the rights of the heirs, who had the right to operate the farms (except the homestead farm) and manage the real estate, with the correlative duty of accounting for the rents and profits thereof. If the strictly legal duties of all had been performed, the result would have been that the heirs would have accounted to the executors for the rents and profits, and the executors in turn would have accounted to the beneficiaries. I have no doubt that, if the heirs had operated the farms (except the homestead farm) and managed the real estate to the best advantage, they would have been entitled in equity to compensation for their services. On that account it would have been inequitable to disallow the executor's claim for compensation for doing that which the heirs might have done and received compensation for it, especially as all the parties in interest consented in advance to his conduct.

In the case at bar the conduct of the executors was illegal, in that they acted in direct opposition to the provisions of the will. Their purpose does not appear to have been dishonest. It was rather to make money for the beneficiaries under the will, of whom each of the executors was one, and it is clear that they were not at all in the same position as the executor in the case of Lent v. Howard, supra, who was allowed compensation.

In speaking of Matter of Braunsdorf, supra, the Appellate Division, in Matter of Popp, supra, 123 App. Div. 2, at page 5, and 107 N. Y. Supp. 277, at page 280, says:

"An executor who was a skilled machinist was allowed compensation by the surrogate for his services in carrying on the mechanical business left by the deceased, the services having been rendered at the request of the next of kin, the parties interested, so as to complete the articles in process of manufacture at the time of the death of the testator. The will did not authorize the continuance of the business."

The learned surrogate who decided that case and the learned Appellate Division that reviewed it in Matter of Popp, supra, placed the decision upon the ground that there was a valid agreement between the next of kin, who were the parties interested, and the executor, to pay him extra compensation for his services. In that respect there is no similarity between the facts herein and Matter of Braunsdorf, supra.

This record is absolutely devoid of any evidence of an agreement between the beneficiaries and the executors that any compensation was to be paid them for their services rendered in the business above mentioned. Not only is there an absence of proof on

that point, but all the inferences that can be logically deduced from the facts repel the possibility of the existence of any such agreement. The executors, who so carried on the business, were the principal beneficiaries under the will, and it was to their own financial interests to disregard the provisions of the testator's will and conduct the brick-manufacturing business, if that course appeared more profitable to them; so that it cannot be said that they were acting entirely for the benefit of others. Self-interest, as much as anything else, may have predominated.

Indeed, there is not the slightest proof that the executors ever expected any compensation. In their former accounting, no claim whatever for such compensation appears to have been made. As far as the evidence discloses, during the period covered by this accounting, such a claim was never mentioned or intimated to exist.

[5] In this connection I have not overlooked the fact that the beneficiaries under the will and those claiming under Allison M. Archer from time to time were paid by the executors and accepted part of the net profits of the business. While that may be an argument against the justice of the contestants resisting the claim for compensation, it does not furnish any proof of an agreement by them to pay the executors compensation for the services rendered in that respect. In paying them such net profits, the executors only performed a duty which was obligatory upon them; and, in accepting the same, the beneficiaries received no more than it was their lawful right to be paid, and it is not apparent to me how any agreement could be inferred from such conduct.

Therefore it is my conviction that there was no agreement to pay the executors compensation for their services rendered in carrying on and conducting the brick-manufacturing business. And Matter of Braunsdorf, supra, is on that point clearly distinguishable. It follows that the claim for such compensation must be disallowed.

[6] The next question relates to the claim that the executors are entitled to extra compensation, in addition to their statutory commissions, for the services rendered by them in renting, collecting the rents of, and superintending the real property generally, in so far as the same was done in accordance with the provisions of the will. This claim is without legal support. Whatever duties the executors performed in that respect, they were obliged to perform under the will, wherein certain trust duties were imposed upon them, and for the performance of which the statutory commissions are the only compensation to which they are entitled. Matter of Popp, 123 App. Div. 2, 107 N. Y. Supp. 277; Clausen v. Puvogel, 114 App. Div. 455, 100 N. Y. Supp. 49; Matter of Hosford, 27 App. Div. 427, 50 N. Y. Supp. 550; Matter of Dummett, 38 Misc. Rep. 477, 77 N. Y. Supp. 1118; Matter of Hayden, 54 Hun, 197, 7 N. Y. Supp. 313, affirmed 125 N. Y. 776, 27 N. E. 409; Van Derheyden v. Van Derheyden, 2 Paige, 287, 21 Am. Dec. 86.

If there had been an agreement between the executors and the parties interested to pay the executors extra compensation for such

services, it could be enforced in this proceeding, but there is absolutely no proof that there ever was any such agreement; and all that has been said in discussing the last question, about the absence of proof as to the existence of an agreement under that element of this proceeding, is also applicable to the proposition now under consideration. In the absence of such an agreement, made in advance, the executors, in the performance of the services which they were bound to perform to carry out the terms of the will, must be conclusively presumed to have been working for and satisfied with their statutory commissions. As a necessary consequence, the claim for such extra compensation must be disallowed.

The statutory commissions and the basis upon which the same are to be computed, and the allowances to be made, will be determined on the settlement of the decree herein.

Decreed accordingly.