And at page 112, 52 N. Y., 11 Am: Rep. 667:

(40 Misc. Rep. 490.)

### In re WAGNER.
### In re GRIFFING'S ESTATE.

(Surrogate's Court, Kings County.   April, 1903.)

1. EXECUTORS—ACCOUNTING—BURDEN OF PROOF.
   The burden of proof is on the contestant attacking an executor's account.
2. SAME—EXPENSES.
   Where an executor has charge of five houses, he may employ his own son to collect the rents, paying him only the customary rates therefor.
3. SAME—SETTLEMENT OF CLAIMS.
   Where an executor settled a bona fide claim against the estate, thereby making a saving to the estate, he should be allowed the amount thereof.

In the matter of the accounting of Arnold H. Wagner, executor of Catherine F. Griffing, deceased.   Motion to confirm report of referee.   Denied.

Michael F. McGoldrick, for executor.
Sondheim & Sondheim, for Marie Obry, contestant.

CHURCH, S.   This is a motion to confirm a referee's report, which passes upon the accounts of the executor and trustee herein. It appears that the executor in question died shortly after making

¶ 1. See Executors and Administrators, vol. 22, Cent. Dig. § 2170.

his account, and before the hearing before the referee. The coun--
sel for the representatives of the dead executor oppose the con-
firmation of said report, contending that the referee has committed
error in the same.

Of the sixteen objections filed to the account of the said executor
but two are sustained by the referee. The referee, however, de-
votes a considerable portion of the opinion given with his report
to a severe criticism of the conduct of the executor; and, as so much
attention has been devoted by the referee in this general disserta-
tion upon the conduct of the executor, it seems appropriate to con-
sider that subject before passing upon the two specific objections to
the account.

A careful examination of the testimony and of the conduct of
this executor convinces me that the referee has committed a grave
error by the sweeping manner in which he has condemned the ex-
ecutor's conduct. On the hearing before the referee the executor's
lips were sealed by death, and it was impossible to explain before
the referee the difficulties and perplexities of his position; but
enough appears to show that the task which was committed to him
was a difficult and extraordinary one, and that he has discharged
the same honestly and faithfully. The burden of proof in a mat-
ter of this kind is upon the contestant, and, where the contestant
fails to produce any direct proof or evidence of careless or impru-
dent conduct by the executor, full faith and credence should be given
to his conduct; and, while executors should be held to a strict ac-
countability, yet the courts, in considering their conduct, should ap-
preciate the fact that many times they have difficult and trouble-
some tasks, caused by decedents leaving their estates in involved
conditions.

When the executor took charge of the decedent's estate, he found
it in the following condition: The household furniture, which was
of the value of some six hundred and odd dollars, was bequeathed
to a son of the deceased, and was taken by him, and hence the ex-
ecutor had nothing to do with same. Deceased owned five pieces
of real estate, consisting of a house on Clinton avenue, upon which
there was a mortgage of $11,000, and four houses on Vanderbilt
avenue, each subject to a mortgage of $3,000. Upon these mortgages
there was interest, which would become due on April and May 1st,
and also water taxes, which would amount to $377.16. In addition,
there were the funeral expenses of the deceased, the expenses of
probate, an attorney's bill of $250, and a claim of one Eva Harring-
ton, which will be referred to hereafter. Outside of the equity in
these houses, there was but $30 in cash, and some silverware, which
was appraised at $65. Therefore, with but this small sum of $30,
the executor had to pay these various obligations accruing against
this real property, keep the same in repair, and endeavor, from any
surplus which he might save from rent, to pay off the obligations
created by the debts of the deceased and the expenses of administra-
tion. The homestead on Clinton avenue the executor was unable
to rent, but in October, 1894, sold it for $15,375. It is not shown
that by the use of any diligence could the executor have gotten any

better price, or that he could have succeeded in renting it in the interim. Out of the proceeds the executor had to pay the mortgage of $11,000; interest amounting to $921.25; taxes, $418.43; expenses of transfer, $66.16; and in addition he paid to the mortgagor of some of the houses on Vanderbilt avenue arrears of interest of $467.-06, and taxes on Missouri lands of $340; thus leaving from the sale of the Clinton avenue homestead a balance of but $2,500. The payment of each of these items is conceded to be proper and correct, and no possible criticism can be made of the executor for making the same. The four houses on Vanderbilt avenue are estimated to have been worth about $4,500 each, as one of these was sold by the executor in October, 1894, for that sum. Subsequently the mortgages on two of these houses were foreclosed, and on the foreclosure sale they brought, respectively, $3,125 and $3,200. Deficiency judgments were entered against the estate on each sale, and it is such mortgagee, as judgment creditor, that contests the conduct of this executor. The fourth house has been held, undisposed of. It is not shown that there was any lack of care in connection with the renting of the houses, or of attention to the same, and it is apparent that if these houses on Vanderbilt avenue had produced the highest rent that Mrs. Griffing had ever received therefor, and had been rented continuously, still the executor would have been very much hampered in his administration of the affairs of the estate. It is a matter of general knowledge that, in the renting of a number of small pieces of real property, there necessarily must be made a deduction for periods when the property is unrented, or when there is difficulty in collecting the rents, and there is not one word of proof showing that the amounts realized by the executor were not the highest amounts that could have been realized with good business prudence. It therefore seems to me that, in the collection of the assets of the estate, the referee, in complaining of the conduct of the executor, by demanding to know "what has become of the enormous balance," is drawing upon his imagination, rather than upon the evidence which is before him.

We next come to the payments made by the executor. In this connection the referee severely criticises and condemns payments made by the executor to the attorney, Mr. North, also made in connection with the affairs of the estate; but, although he criticises, he allows such expenditures. If the referee believed that these expenditures were for improper services or were excessive in amounts, then he should have promptly sustained the objections, disallowed the payments of the same, and surcharged the executor therewith. If, on the other hand, they are proper, then no criticism should be made of the executor for paying the same. But the criticism of the same by the referee does not seem to be supported by the testimony, and is evidently a misapprehension of the same, as the deduction seems to be that Mr. North received, in connection with a number of accounts, nearly $500, whereas the facts seem to be that Mr. North charged for probate the sum of $50, for adjusting the collateral inheritance tax a further sum of $50, and for services in the foreclosure suit, which resulted in relieving the estate of $577.94

costs, the sum of $65. Each of these charges seems to me to be perfectly reasonable and proper in connection with this estate, particularly as it appears that there was some trouble in connection with discovering the whereabouts of some nonresident heirs. If they are reasonable and proper, they should not be made the subject of any adverse criticism. It also appears, without any question, that Mr. North acted as counsel for the testatrix in her lifetime on certain important litigation; that his bill therefor was $250, which he finally compromised at $200; and it seems to me that the executor was entitled to credit for the same, without any slur or insinuation that they ought to have been disallowed, but for the failure of the contestant to make the proof; and it is difficult to see how the contestant could have made any proof, in the face of the direct testimony of the rendition of the services, and the fairness of the value of the same, given by the executor, and the presumption that a man rendering services is to be paid.

The referee also criticises the executor for not making prompt disposal of such real estate. It must be borne in mind that in the years 1892 and 1893, the years when the executor first took charge of this matter, it was a period of great commercial and business depression, and that, if the executor had attempted to force the sale of this real property, it is very probable that it would have resulted in greater damage to the estate. The contestant has failed to call any experts to show that this real property was capable of quick sales, or that there was any possible customer for same at this period. The rent which the executor managed to get from this property which he succeeded in renting was greater than he would have received from an ordinary investment on mortgage, such as he would have been authorized to make.

It is also to be noted that none of the legatees under this will have made any criticism of the conduct of the executor in any way, but that the sole complainant is this mortgagee, who subsequently became a judgment creditor of the estate by forcing the sale of the real estate under the mortgages held by her, and thus made a deficiency judgment. For her to complain that a higher price was not obtained at a private sale by the executor, so that when a forced sale was had there would be money to meet her deficiency judgment, is extraordinary, particularly in view of the fact that at the foreclosure sale she bought in these houses. If they were so valuable, and the executor could have so readily sold them at a price far in advance of the mortgage, why did not the mortgagee take them for the amount of her judgment? If, on the other hand, they are not valuable, and worth but little more than the price at which they were bid in, how can the executor be reprimanded for not disposing of them at a private sale at a price ample to meet her deficiency judgment?

There remains to be considered the two specific items on which the referee has surcharged the executor. They are as follows, namely:

First. Payments of commissions by the executor to his son Gerard Wagner for collecting rents and attending to the estate, amounting

to the sum of $419. It is conceded that the price charged is at the proper ratio, if it had been paid to the ordinary real estate agent. It does not seem to me that the executor of an estate, where the same consists of real property, is bound to do all the ordinary work of a real estate agent, and he is therefore entitled to employ a proper real estate agent and pay him the usual commissions. We know, as a matter of business experience, that many persons owning real property that is rented to numerous tenants do not attempt to attend to the management of the same, but turn the same over to some competent agent, who has their respect and confidence. The referee does not seem to contend that this is other than the correct theory, but contends that the person collecting these rents was the son of the executor, and that they should therefore be disallowed. It seems to me that the main question is whether the expenditure is a reasonable and proper one, which the executor was authorized to make. If he chooses to have this work done by his son, outside of the regular work which his son would naturally do, and the charge is a proper one, there is certainly nò reason why it should not be sustained. Of course, under ordinary circumstances, employment by an executor of a member of his family to perform services for an estate merits investigation, but where they appear to be services, which, if they had been rendered by a disinterested person, would pass without question, then there is no reason for disallowing the same. The ᵒsuggestion that no voucher is filed for this matter seems to me to be immaterial. It plainly appears by the books that it was paid. The son is alive, and has sworn to the correctness of the same, and, of course, could give a voucher at any time; and the rule requiring an executor to file vouchers' was not intended to apply to a matter of this character.

Second. The payments made to Eva Harrington, amounting to $595.83. It is not claimed that the executor did not in good faith pay the items aggregating this amount to Eva Harrington, and take her receipt therefor, but, because he had not invested the sum for her in accordance with the provisions of the will, he should be punished by the disallowance of the items which he had actually paid. Eva Harrington evidently had some claim for services rendered to the deceased, and hence it was provided in the will that the sum of $3,000 was to be invested for the benefit of the said Eva Harrington, upon the said Eva Harrington electing to waive any claim which she might have for services against the deceased. At the time of the decedent's death, as has been shown, there was not only no money to invest, but there was pressing necessity for funds to pay obligations accruing against the real estate, and due against the estate. That being the case, it was very necessary that the executor should endeavor to prevent the said Eva Harrington enforcing her claim, which she might have done. Being a legacy in place of a debt, the party would be entitled to interest from the death of the testatrix. Dayton on Surrogates, 464. But the executor, however, paid interest only from one year after he received his letters, and was thus fully justified in quieting the claim of the legatee, and the estate received the benefit of her not enforcing her claim. Undoubtedly, if the executor had conducted a forced sale, and managed to realize $3,000 from all of these pieces of real estate and at once in-

vested the same for the benefit of Eva Harrington, he would have been entitled to pay her the income therefrom. By deferring this sale and collecting rents from this real estate he got a very much larger income than he otherwise would have had, and the principle which has disallowed moneys which he in good faith paid out in an endeavor to extricate the estate from a difficult position seems to me to be taking altogether too narrow a view of the situation.

As the theory upon which the referee disallowed the commissions was based upon his criticism of the general conduct of the executor, and also upon his disallowance of the two items above stated, and, as indicated herein, I have disagreed with the referee's conclusions in these .particulars, it necessarily follows that his disallowance of the commissions should be overruled. The motion to confirm the report of the referee is denied, and the account settled as presented, with costs to the executor against said contestant.

Motion denied, with costs to executor against contestant.