In the Matter of the Estate of JACOB RICHMAN, Deceased.

Surrogate's Court, Kings County, December 7, 1931.

*Myron Sulzberger, Jr.,* for the petitioner.

*Joseph Olshansky,* for S. & B. Pastry Co., Inc., Charles E. Vetter and L. Goldberg.

*Rasch & Richman,* for the administratrix.

*Jacob I. Berman,* for creditors.

*Frederick W. McGowan,* for the National Surety Company.

*Jonas & Neuburger,* for the Manufacturers Trust Company.

WINGATE, S. While contests respecting insolvent estates are wont to prove acrimonious and pleonastic, the proceeding at bar has set something of a record in this regard. Its trial has consumed almost six full court days and has produced a record of over five hundred pages. The ultimate result of this weary welter of words is strongly reminiscent of the progeny of the mountain in labor, immortalized by Horace.

The questions of law involved are few and insignificant, the determinable issues being chiefly confined to questions of the comparative veracity of witnesses and to the inferences properly deducible from the portions of the testimony which are deemed credible. The consideration of the case has been materially complicated by the failure of counsel to limit their inquiry to matters relevant to the actual issues involved, and by the indefatigable efforts of respondents to force testimony from many of the witnesses on subjects with which they were in no wise materially connected and concerning which they obviously possessed no reliable information and expressly disavowed any knowledge whatsoever.

From this plethora of irrelevant testimony, the court will endeavor to extract the comparatively few pertinent portions, so far as may be necessary to make its result intelligible.

The decedent, for a number of years prior to his death on August 31, 1929, was chiefly engaged in the conduct of a cafeteria at 24 East Twenty-third street, New York city. He was not the owner of the building. In the spring of 1926 he conceived the idea of taking over the building, together with the adjoining one, on long term leases, and of improving and renting them. For this purpose he organized a New York corporation which received the corporate designation of Belmore Trading Corporation. All necessary corporate formalities were complied with, and under date of May 1, 1926, a twenty-one-year lease was entered into between this newly-organized company, as tenant, and the owner of the premises, as landlord. The buildings in question were thereupon extensively improved, and the portions not occupied by decedent's cafeteria were, so far as possible, rented to subtenants. The method by which the improvements were financed does not fully appear from the record. It was, however, shown that a portion of the expense was met by loans of money belonging to one Gussie Diener. The uncontradicted testimony is to the effect that decedent solicited her on the subject of such loan of her savings to the Belmore Corporation, that she assented thereto, and received as evidence thereof a note made by the corporation, which matured after the intestate's death. Apparently a considerable portion of the expense was met by a series of notes from the corporation to the contractor.

Additional moneys were also borrowed on the notes of the corporation from a concern known as Gibraltar Finance Company.

The decedent continued to conduct the cafeteria up to the time of his death. The court is satisfied from the testimony adduced that he confided little in his family respecting the details of his affairs, and that they took no active part in their management until his final illness in the early summer of 1929, and even then, acted only as he directed them.

On or about March 1, 1928, decedent, for some reason which does not clearly appear, signed a financial statement to the Manufacturers Trust Company, the chief objecting creditor, giving his net worth as $61,294.08. Among the assets listed therein are stocks and bonds, $21,000; " Fixtures and Equipment and Construction," $30,730.50, and " Life insurance Estimated Cash surrender value," $10,000. The details of the stock and bond item are listed as stock of Crescent Realty Company, $20,000, and stock of Belmore Trading Company, $1,000. The total life insurance was given as $27,000.

As of January 1, 1929, an additional credit statement was executed by him as a basis for a loan. This showed a net worth of $97,600.35, including among the asset items " Stocks and Bonds (at Market) estimated," $70,000; " Machinery and Equipment, Fixtures," $30,953.83; " Insurance (Cash surrender value — estimated)," $14,000.

At his death it was found that there was no insurance payable to the estate, but there were policies in which the widow was named as beneficiary aggregating $25,000, which sum was depleted by policy loans, the amounts of which were not made to appear. In this connection, counsel for respondents remarked with some pertinency (S. M. p. 7): " If he had a modern policy he could not possibly have a $14,000 surrender value on only $25,000 worth of insurance." This observation would seem equally applicable to the $10,000 cash surrender value " estimated " on the $27,000 face value of the policies shown in the 1928 statement.

The apparent discrepancy in this particular, emphasized by respondents themselves, naturally tends to discredit the accuracy of the other assertions respecting the asserted worth as set forth in the statements. This subject will be further considered in another connection.

For a short time succeeding his death, decedent's sons attempted to continue the cafeteria business. Being apparently totally unfamiliar therewith, it is not surprising that they failed to succeed therein, or, as respondent somewhat pungently remarked in its brief, miserably mismanaged it. In any event, they promptly

determined that they were unqualified to perform the functions of boniface, and, acting on behalf of the Belmore Corporation, negotiated a sublease of that portion of the Twenty-third street buildings formerly occupied by the decedent's cafeteria to an independent corporation. The consideration for this lease was $16,000 paid in cash, and a series of notes aggregating $9,000, payable at the rate of $200 per month. It was testified without contradiction that the $16,000 cash payment was entirely expended in the solution of various obligations of the Belmore Corporation, over $10,000 going out in satisfaction of back tax obligations on the property and for commissions on negotiating the lease, about $3,800 being paid on the construction notes of the company, and the balance in liquidation of others of its obligations. About the same time, also, the corporation note to Mrs. Diener, for moneys loaned for construction purposes, fell due, and after fruitless attempts to obtain payment she brought suit against the corporation and recovered judgment thereon. This was satisfied by the assignment to her of the remaining portion of the $9,000 of notes, which then aggregated a face value of about $8,200, her judgment being somewhat in excess of that sum. The affairs of the Belmore Corporation went from bad to worse. Portions of its rentable space became vacant, one of its most important tenants made an assignment for benefit of creditors, and finally, the owner of the premises evicted it for failure to make certain payments required by the lease. After a number of additional judgments were recovered against it, the corporation was, on October 3, 1930, legally dissolved with no assets and a plethora of liabilities.

With this general outline of events as a background, it now becomes necessary to consider the specific objections interposed to the account of the administratrix and of the support therefor, which may be gleaned from the record. They are five in number. The *first* is the alleged failure of the administratrix to include in her account all of the assets of the deceased; *second*, the failure to include this alleged interest in Crescent Realty Company stock; *third*, her failure to include any interest in the Belmore Trading Corporation stock; *fourth*, the claimed failure to include the full proceeds derived from the sale of the cafeteria conducted by decedent at 24 East Twenty-third street, New York city; and *fifth*, objection to the listing of decedent's leasehold at 1249 Bedford avenue, Brooklyn, as valueless.

The first and last enumerated objections are capable of ready disposition. No proof whatsoever was introduced in support of the first, except as relating to some of the others. Therefore, if this general objection be construed as being in addition to the

other specific ones, it has nothing upon which to stand. The leasehold was duly appraised by the official appraiser of this court as possessing no value. The propriety of this estimate was indicated by the demonstrated fact that it was sublet to an independent concern at precisely the same rental as was reserved in the lease to the decedent. No evidence was presented by the objectors that this was an improvident act or that it would have been possible to obtain more for it. These two objections are, therefore, overruled.

Turning now to the objection relating to the non-inclusion of the Belmore stock, much of the pertinent history of this concern has already been rehearsed. At the time of its organization the subscribers for its stock of twenty shares were the decedent, eighteen shares; his son, Joseph, one share; and a dummy, one share. The right to subscribe for the nineteen other shares was assigned to the son, who, pursuant to decedent's direction, assigned them to one Benjamin Glaser, who about the same time married decedent's daughter. The unrefuted testimony shows that a certificate for the entire authorized stock was issued to Glaser as a wedding present and that no other stock certificate was ever issued by the corporation. It was demonstrated that Glaser never took any part in the corporation's affairs until after decedent's death, and that it was wholly managed by decedent during his lifetime. Mr. Glaser testified that it was his understanding that the decedent should run the business without his interfevence; that it was not yet on a sound basis, and that when it was, he expected to receive any profits which might accrue; that while it was a gift, it was one from which he could only hope that improvement of affairs might make future pecuniary benefit possible.

Respondent's only attack on this transaction is by suspicion and inference. It is contended that since decedent transacted the business as his own, the corporate veil should be lifted, all assets of the business treated as those of decedent individually and brought into the common hotchpot. This contention, in view of the uncontrovertible claims of others against the corporation as such, loses sight of the basic prerequisite to the application of the principle invoked.

A corporation, validly organized, is a legal entity separate from its stockholders, and, as such, is capable of incurring and acquiring valid obligations and rights distinct from those of its stockholders. (*Werner* v. *Hearst*, 177 N. Y. 63.) While courts have on rare occasions disregarded this legal conception, such action has occurred only where it was made to appear that the incorporation was effected solely " for the purpose of evading the law, or for the perpetration of fraud." (*Erickson* v. *Revere Elevator Co.*, 110

Minn. 443.) A piercing of the veil of corporate entity can only be accomplished where extremely cogent equities for such a procedure are demonstrated and the rights of third parties would not thereby be jeopardized. (For illuminating discussions involving these principles, see the articles by Prof. Wormser in 12 Columbia Law Review, 496, and 23 id. 702.) In the case at bar it is obvious that the decedent's purpose in the organization of the corporation was merely the usual and entirely justifiable object of limitation of liability. Furthermore, any determination such as respondents seek necessarily encounters the more potent equities possessed by the creditors of the corporation, who looked to and relied upon its credit as a separate legal person. Were the positions reversed, and purely corporate creditors were seeking to decrease the respondents' distributive shares in the decedent's estate, the objecting creditors would be the first to assert the separation of identities and the potency of the principle of limitation of liability.

The further pursuit of this portion of the case is profitless. The corporation is defunct. Its assets have been distributed among its creditors. There is no demonstration of any bad faith or mismanagement of its affairs and these respondents have not and never did have any dealings or privity with it. The question of whether decedent at his death was the real owner of its stock, or whether it belonged to Mr. Glaser, is purely academic, since in any event it is valueless. *Prima facie*, it belonged to Glaser since it was issued to him. The third objection is, therefore, overruled.

The next objection relates to certain shares of the Crescent Realty Company. The record clearly demonstrates that this stock was sold prior to the death of the decedent, wherefore, technically speaking, the objection has no merit. It appeared, however, that at the time of its sale for $6,000 in August, 1929, $4,000 of the proceeds were used in the payment of certain obligations of the decedent and the other $2,000 were paid to the widow. Viewing this objection, therefore, in its broader scope, the question becomes pertinent as to whether or not the widow was entitled to this $2,000 of the sale price in her individual capacity. The record discloses that prior to the year 1920 the decedent was the owner of this stock. All witnesses examined, however, testified that on the twentieth anniversary of his wedding he presented the certificate to the accountant indorsed in blank and that she continually had it in her possession from that time until approximately the date of its sale. Various negotiations for its prior disposal were made, but all of the testimony in this regard naturally leads to the inference that they were conducted on her behalf. It is entirely true that payments were made by the Crescent Corporation to the

decedent between the time of the alleged gift and the time of the sale, but whether these were by way of salary, as testified to by certain independent parties, or as a direct return on the investment, is immaterial. In either event they would not be determinative of the fact of actual ownership. (*Matter of King*, 230 App. Div. 160, 161; *Judson* v. *Hatch*, 171 id. 246, 249.) If the testimony of all of the witnesses who were examined on the subject is believable, a valid gift *inter vivos* was made and an actual *bona fide* transfer effected in 1920. The court, as the trier of the facts, credits the testimony. This objection is, therefore, also overruled.

The final pertinent question raised by the objections concerns the alleged failure of the administratrix to include in the assets of the estate the full value received for the cafeteria business conducted by the decedent up to the time of his death. In spite of the repeated prolix examinations of various parties, respondents have utterly failed to demonstrate that anything was or should have been received in this regard which was not accounted for. Unquestionably there was certain equipment in the cafeteria at the time of the decedent's death.

Two alleged experts on values of such matters were presented, both of whom testified that property of this nature which had been used for considerable period, as this had, possessed no sale value whatsoever when divorced from the business with which it was connected. It is entirely apparent from the testimony of all the witnesses examined on the subject, not only those friendly to the administratrix, but those hostile to her, that no property was so turned over to the new corporation which took over the lease of the premises in which the business was conducted. The successor business completely refurnished the premises. In any event, the burden of proof was not upon the administratrix to demonstrate that the alleged asset had no value, but was upon the objecting parties to show the contrary. (*Matter of Mullon*, 145 N. Y. 98, 104; *Matter of Rogers*, 153 id. 316, 328; *Matter of Stevenson*, 86 Hun, 325, 327; *Matter of Baker*, 42 App. Div. 370, 372; *Matter of Perry*, 129 id. 587, 588; *Matter of Hunter*, 170 id. 934; *Matter of Swiller*, 205 id. 302, 305; *Marre* v. *Ginochio*, 2 Bradf. 165, 167; *Matter of Palmer*, 3 Dem. Sur. 129, 130, 131; *Matter of Wagner*, 40 Misc. 490, 491; *Matter of Fisher*, 124 id. 836, 839; *Matter of Murtha*, 130 id. 330; *Matter of Schlossman*, 136 id. 893, 897.) This they made no effort to do. The contention that a portion of the consideration for the new lease to the premises which was paid to the Belmore Corporation should be considered a payment for good will of the cafeteria business is purely speculative. No demonstration was made that any good will existed. The business

was not continued by the corporation which rented the premises, since it was conclusively demonstrated that for some period after the keys were turned over to the new lessees the premises were vacant pending the completion of alterations and changes. It was further shown that from six to eight other restaurants or cafeterias were located on the same block on which the decedent had conducted his business. Finally, the decedent had no lease of the place in which the business was conducted, being merely a month to month tenant. Under these circumstances the court, as an average member of the community, would be inclined to doubt that any good will was connected with a purely personal business of this nature. *A fortori*, it would not take judicial notice that any such good will existed. This final objection is, therefore, also overruled, since here again the burden was on the objecting parties to make an affirmative demonstration of the fact, and they have failed to do so.

Much of the unnecessary acrimony of the trial was precipitated by the wholly irrelevant effort of the respondents to demonstrate that one of the sons of the deceased had uttered a note, executed by the decedent, subsequent to the latter's death. This effort was based almost wholly on the testimony of a minor officer of the bank, which testimony the court views as being wholly unworthy of belief. Whereas he insisted that the renewal note was given on September 3, 1929, the previous note having fallen due on the first, which was Sunday, the succeeding day being a holiday, it subsequently developed that this testimony was based solely on records which might have referred to experiences and conversations which took place prior to the date of record. It further appeared that on August twenty-ninth, the date when decedent's sons testified the new note was given and the arrangement for renewal made, a check was deposited in the bank to meet the partial payment on the note which was admittedly required by the bank as a condition to the extension. It is most improbable that this would have been done on this day if, as testified by this witness, the condition was first imposed four days later. Furthermore, it is most unlikely that this pressing obligation of the decedent, which was due on September first according to its terms, should have been left unattended to until two days after its apparent maturity. Not only the content of the testimony of this witness, but his manner and conduct on the stand, were such as to strongly incline the court to place materially greater credence in the testimony of the opposing witnesses.

The statements of respondents' counsel at the trial and in their memorandum are replete with charges of forgery directed at the sons of the decedent. In justice to these young men, it should

be noted that there is not a scintilla of evidence in support of any such position. On a certain occasion during the hearing when one of these charges was made, one of these sons offered to respondents' counsel that if the latter would call any handwriting expert and such individual should testify that any of the questioned signatures of decedent were forgeries, the son would personally defray all expenses attendant upon such examination. This direct challenge went unaccepted. In spite of this fact, respondents, in their brief, again revive the charge with the statement that "a mere lay examination of the documents" offers support therefor. In the opinion of the court this is flatly untrue and the injection of this collateral issue into the case was unwarranted and unjustifiable on the facts adduced.

Respondents' brief also lays considerable stress on the alleged evasiveness of certain replies by decedent's sons. In so far as this criticism has any basis in fact, the situation is fully comprehensible, as an inevitable result of the wholly irrelevant imputation, made almost at the beginning of the hearings, of the commission of acts which might amount to criminal offenses in connection with the alleged delivery of the renewal note after the death of the decedent. In effect the adoption of this attitude gave notice to all witnesses who appeared on behalf of the administratrix or were connected with her, that it was respondents' intention to take every possible advantage whether fair or otherwise which might be presented. In this situation it is not to be wondered at if such witnesses exhibited extreme reluctance in testifying.

One final issue injected into the case may deserve a few words of passing comment. This relates to the two statements of worth signed by the decedent and submitted to the bank. In certain respects these were misleading to a degree, but before the conduct of the decedent in issuing them is judged with too great harshness it would be well to analyze them together. Three and only three of their items have been challenged. These are as follows:

*Statement as of* March 1, *1928*

| | |
|---|---|
| *Stocks, Bonds, Mortgages and other investments as per list on Reverse Side*............................ | $21,000 00 |
| Crescent Realty Co., 210–212 W. 42nd St., N. Y. C. (Stock)....................................... | 20,000 00 |
| Belmore Trading Co., 24 E. 23rd St., N. Y. C. (Stock)....................................... | 1,000 00 |
| *Fixture and Equipment* & Construction............ | 30,730 50 |
| *Other Assets* | |
| Life Insurance (estimated cash surrender value).... | 10,000 00 |
| *Life Insurance (Give Details)*..................... | 27,000 00 |

*Statement as of* January 1, *1929*

| | | |
|---|---|---|
| *Stocks and Bonds (at Market)* estimated............ | \$70,000 | 00 |
| *Machinery and Equipment* } *Fixtures*............... } .................... | 30,953 | 83 |
| *Other Assets (give details)* | | |
| Insurance (cash surrender value — estimated)....... | 14,000 | 00 |

The portions of the foregoing which are italicized are printed, while the balance is pen written.

It is obvious that the figures of \$30,730.50 and \$30,953.83 in the two statements are intended to refer to the same thing. In this connection, the pen addition of " & construction " in the earlier indicates to any reasonable mind that what decedent thereby intended was the sum which had been expended in the alteration of the Twenty-third street building.

The 1928 stock item was obviously inserted as an inclusion of all the family assets which no doubt would have been voluntarily made available for him had he continued to live and needed them, as was demonstrated by the widow's action with the Crescent Realty stock just before his death.

Each of the other figures in question is expressly qualified as to value by the word " Estimated," which both in legal and common parlance is connotative of a lack of definiteness. The Standard Dictionary gives as the definition of " estimate: " "A valuation based on opinion or roughly made from imperfect or incomplete data; a calculation not professedly exact."

The natural inference to be drawn from these considerations and from the fact that the inclusions in the bodies of the two instruments are neatly printed in pen while decedent's signatures are written in a distinctly non-Spencerian scrawl, is that decedent had general talks with the credit men of the bank, whereupon the latter filled out the main portions of the instruments and then showed decedent the place where his signature was desired. However this may be, and it is obviously pure conjecture, the bank can hardly be considered as other than a contributing factor in their own loss in this connection. They were placed on notice that at least a portion of the " equipment " item, sufficiently material to require its note, was merely construction cost, and that the value of all of the other questioned items was merely " a valuation based on opinion " or a " calculation not professedly exact." Obviously, as determined by the event, they constituted in large measure a capitalization of hopes and expectation, the realization of which may have been wholly prevented by death.

These thoughts are relevant only in justice to the memory of the decedent.

The merits of the proceeding have already been considered, and on them, were it necessary so to do, the court would have no hesitancy in finding that the accountant herein had affirmatively demonstrated that her account was correct. It may, therefore, the more readily be decided that the objecting parties have wholly failed to sustain the burden which the law imposes upon them by showing its incorrectness.

The objections are, therefore, wholly overruled. Proceed accordingly.