In the Matter of the Estate of JOSEPH STULMAN, Deceased.

Surrogate's Court, Kings County, March 16, 1933.

*Greene & Hurd* [*F. B. Hamlin* of counsel], for the petitioner Manufacturers Trust Company.

*John L. Bernstein,* for the petitioner Ida Stulman.

*Arthur Shorwitz,* for the petitioner Julius Stulman.

*Walter Jeffreys Carlin,* special guardian for Esther Stulman, Miriam Goldenthal and Stephen Stulman.

*I. Arnold Himber,* for Sophia Stulman and Pearl Goldenthal.

*Stroock & Stroock,* for Montefiore Hospital for Chronic Diseases.

*Frank, Weil & Strouse,* for National Jewish Hospital.

*Lachman & Goldsmith,* for Young Men's Hebrew Association.

*Furst, Schwartz & Schwager,* for United Jewish Aid Society.

*Rosenson & Lorence,* for legatees Young Men's Hebrew Association, Williamsburg Branch, and Young Women's Hebrew Association, Williamsburg Branch.

WINGATE, S. In the petition on this special proceeding for construction, the executors have propounded thirty-three questions under seventeen headings for determination by the court. One was absolutely withdrawn during the course of the hearing, and the decision in respect to another is, by consent of all parties, to be withheld to permit of the presentation of further evidence. Thirty-one, therefore, remain for present discussion. The court has been favored by unusually able and comprehensive briefs on the law and facts by ten of the parties. These have approached the solution of the questions involved in a commendably helpful and dispassionate manner.

Much, if not the greater part, of the evidence adduced on the hearing and admitted subject to objection, was wholly irrelevant to the issues. The will at bar was executed on July 1, 1930. All of the problems of intention presented are, therefore, determinable

solely in the light of the facts and circumstances then existing and theretofore occurring, in so far as knowledge in respect to them was possessed by or logically attributable to the testator. (*Matter of Smallman,* 138 Misc. 889, 896; *Matter of Sheffer,* 139 id. 519, 522; *Matter of Tuozzolo,* 141 id. 251, 253; *Matter of Mehler,* 143 id. 63, 64; *Matter of Marsh,* Id. 609, 615; *Matter of Mann,* 145 id. 360, 361; *Matter of Hoffman,* 146 id. 535.) Since the testator cannot be presumed to have possessed any prophetic vision, it obviously follows that any occurrences which transpired subsequent to the time of the execution of the document, are wholly irrelevant in an effort to determine his then existing state of mind and testamentary wishes, as then expressed. (*Matter of McCafferty,* 142 Misc. 371, 373, 374; affd., 236 App. Div. 678; *Matter of Kirkman,* 134 Misc. 527, 529; *Matter of Gargiulo,* 138 id. 90, 99; *Matter of Morningstar,* 143 id. 620, 622, 623.)

One specific item of evidence, adduced at the hearing, and likewise admitted subject to objection, merits individual treatment. This was an unsigned sheet of paper (Joseph Stulman, Exhibit No. 1), stated to be in decedent's handwriting and found among his papers. This purports to demonstrate the manner in which he believed his wife and children would fare financially after his death. It is primary that a testator's intent must be gathered solely from the words employed in his testamentary document when read in the light of his then existing circumstances. (*Matter of Shumway,* 138 Misc. 429, 434.) A writing not duly attested according to law is, therefore, inadmissible in any inquiry into the disposition actually effected or the manner of devolution intended. (*Matter of Judge,* 141 Misc. 254, 255; *Matter of Schrier,* 145 id. 593, 595.) This exhibit, as well as the irrelevant portions of the testimony and other accompanying exhibits, have been disregarded by the court in the results herein attained.

For a number of years prior to his death on October 17, 1931, decedent was engaged in business with the Stulman-Emrick Lumber Company, which was a close corporation, of which he owned 925 out of a total of 1,000 shares. The balance stood in the name of his son Julius, who was associated with him in the enterprise. This corporation did a wholesale business, its retail department being separately incorporated with the title Hoban-Hunter Distributing Yards, Inc. The total stock of this subsidiary was also owned by the decedent. This business interest constituted testator's main asset at the time the will was drawn. In 1928 the decedent received a salary of $20,000 from the corporation, which nevertheless showed a net profit of $6,705.61 for the year. This

additional sum was added to surplus bringing the latter item to a total of $19,821.14. Shortly after a stock dividend of $16,000 was paid to the decedent only, completing the issuance of the entire authorized capital. In 1929 decedent reduced his salary to $15,000, in spite of which the corporation showed a loss of $1,626.18 for the year, and with the beginning of 1930 its capital was impaired to that extent. His salary for 1930 was fixed at the same figure, but the results of the corporate operations for that year are irrelevant to the present inquiry because the will was executed when the year was only half over.

Whereas certain portions of the testimony indicate a certain informality in decedent's dealings with the corporation, which is not unusual in such matters when the business affairs are on a sound basis and the stock substantially wholly owned, the court is unimpressed with the contention of certain parties that testator's mental attitude toward it, as evidenced by his acts, was such as to warrant a disregard of the corporate entity.

It was testified without contradiction that there was no relation between the amount drawn by the decedent as salary and the sums which he was accustomed to charge off for bad debts at the end of each year on a personal analysis of the accounts. His salary was fixed at the beginning of each year and was withdrawn by him at periodic intervals without any particular reference to the state of the business. Although he loaned sums to the corporation from time to time, these were invariably entered in the books of the company as loans, and were apparently in all respects treated as ordinary commercial accommodations.

The testator's immediate family consisted of his wife, Ida, a son, Julius, and three daughters, Pearl, Sophia and Esther, the last named an infant of twelve and a half years at the time the will was drawn. The son had for a number of years been connected with the business and, aside from the testator, appears to have been the only one employed in an executive capacity. The son was married but at the date of the will had no children. Pearl, at the date of the will, was also married and childless.

On June 21, 1929, testator established an *inter vivos* insurance trust, primarily for the benefit of his wife, the precise terms of which are here immaterial except that it provided for the payment of the entire net income to the wife for life.

The will, the construction of which is the subject-matter of this proceeding, gives internal evidence of careful draftsmanship and while long, does not appear unduly prolix in view of the fact that the estate of the testator, even at the presumably depreciated values existing at the time of his death, disposes of assets of upwards

of a quarter of a million dollars in value. While considerable controversy has arisen in respect to its meaning, the court cannot but feel that a not inconsiderable portion thereof arises by reason of the wishes of the parties that the testator had made a disposition of his property differing from the one which he did. Since, however, the assets which form the basis of distribution happened to be his, the relative desirability of some other arrangement is a matter of infinitesimal moment.

In view of the multiplicity of the points presented for clarification, and the fact that they involve determinations respecting the meaning of the greater part of a rather long document, it will presumably promote clarity if the various questioned portions are quoted and the questions in respect to each segregated.

In the "sixth" item the testator provides: "I hereby bequeath unto the following societies, organizations and institutions, payable as and when hereafter directed, the following sums of money: " then follow fifteen gifts to as many identified charities in specified sums aggregating $20,000, the item continuing: " I direct that payment of these bequests shall be made to said institutions three years after the date of my decease and not prior thereto, without interest to the date of payment thereof."

The questions in respect to this direction are whether these legacies are valid; if so, when they will be payable and whether or not they will draw interest from such date.

It is entirely clear that the gifts to the respective charities are certain and vested and in all respects valid. (*Fulton Trust Co.* v. *Phillips*, 218 N. Y. 573, 582; *Matter of Berry*, 154 App. Div. 509, 511; affd., 209 N. Y. 540.) The direction obviously falls within the fourth classification of *Clark* v. *Cammann* (160 N. Y. 315, 324), that "if the gift is absolute and only the time of payment is postponed, the gift is not suspended but vests at once."

The limitation of three years on the time of payment is, however, invalid, since it effects a restraint on alienation for a period measured other than by lives in being at the death of the testator. (Real Prop. Law, § 42; Pers. Prop. Law, § 11.) This does not, however, invalidate the entire bequest, since the illegal direction will be deleted (*Matter of Hitchcock*, 222 N. Y. 57, 73), with the result that the gifts in question will stand on the same basis as general legacies in respect to which no limitation is inserted. While this result may, as suggested, be effected by the application of the principle of acceleration (*Matter of Terwilligar*, 135 Misc. 170, 184; affd., 230 App. Div. 763), such process is really unnecessary, since by the excision of the ineffectual limitation the direction is valid as it stands. (*Matter of Terwilligar, supra,* 181, 182; *Matter*

*of Enright*, 139 Misc. 192, 199; *Matter of Meyer*, 140 id. 1, 5; *Matter of Knoll*, 146 id. 613.)

So far as this court is aware, the question of the time from which a general legacy will draw interest has not been decided since the amendment of section 218 of the Surrogate's Court Act, which took effect on April 21, 1931, as to the estates of all persons dying thereafter.

The principle upon which interest becomes payable in any case is that it is a species of damages for the withholding of a sum of money after the maturing of the obligation of the debtor to pay it to the creditor. (*Matter of Rutherford*, 196 N. Y. 311, 313; *Matter of McGowan*, 124 id. 526, 530; *Matter of Shevlin*, 143 Misc. 213, 215; *Matter of Murdoch*, 142 id. 186, 188.) In other words, the interest is payable from the time, and only from the time, that the creditor has a legal right to demand payment of the principal sum, and the debtor fails to make it. The noted alteration in the provisions of section 218 of the Surrogate's Court Act gives no such right to the creditor but merely changes from one year to seven months after the grant of letters the period during which the estate fiduciary is *forbidden* to make payment in the absence of express testamentary or judicial direction. The right of the payee to demand payment is, however, regulated by section 146 of the Decedent Estate Law, which has not been changed, and which, so far as material, reads: " If, after the expiration of one year from the granting of letters testamentary or letters of administration, an executor or administrator refuses, upon demand, to pay a legacy, or distributive share, the person entitled thereto may maintain such an action against him, as the case requires." This is the sole charter of the rights of the legatee contained in the statutes of the State, and is in no wise in conflict with the *permissive* authority to the fiduciary to make payment at an earlier time if he deems such action to be for the advantage of the estate. It must be determined, therefore, that the legacies here in question will be payable at the expiration of one year from the date of letters and will bear interest from that time.

The second question relates to two conditional bequests of $10,000 each to testator's unmarried daughters, Sophia and Esther, payable only when and if they marry. The questions in respect thereto are whether these gifts are valid and whether they are vested or contingent.

No one has contested their validity, which seems apparent on primary principles. (*Oliver* v. *Wells*, 229 App. Div. 356, 359; affd., 254 N. Y. 451, 459; *Matter of Bailey*, 141 Misc. 748, 751.) It is quite obvious that it was testator's intent that the gifts thereby

made should be in the nature of marriage portions or doweries. It must, therefore, follow that marriage by the respective legatees was a condition precedent to their becoming entitled to the subject-matter of the gifts. (*Burns* v. *Clark*, 37 Barb. 496, 498; *Bullard* v. *Village of Albion*, 128 Misc. 292, 297.) All this, while perhaps quite interesting, is of no great practical moment. Although the estates be contingent, they are nevertheless valid, since the restraints on alienation of the several principal sums must inevitably terminate with the lives of the respective legatees, and are, therefore, not in contravention of the statute.

The remaining questions relate primarily to items " eleventh," " twelfth," " thirteenth " and " fifteenth " of the will, which will be separately treated.

The main plan of the testamentary disposition contemplated the erection of two trusts, the principal fund of the first, for which directions were given in item " eleventh," being testator's ownership of the capital stock of Stulman-Emrick Lumber Co., Inc., which was, as hereinbefore noted, the largest single item of his estate. The situation of the testator and his son, Julius, in respect to this corporation at the time of, and prior to, the execution of the will, has been considered. This item reads as follows:

" *Eleventh*. I give, devise and bequeath all of the shares of capital stock owned by me in Stulman-Emrick Lumber Co., Inc., a domestic stock corporation, to my executors and trustees herein named and their successors, to hold the same in trust, nevertheless, during the lifetime of my wife, for the uses and benefits hereinafter mentioned, to-wit: Out of the income, dividends and profits thereof, the sum of Five Hundred ($500.00) Dollars per month shall be paid to and become part of the income of my residuary estate; and the balance of said income, dividends and profits thereof shall be paid to my son Julius Stulman, during the lifetime of my dear wife, as follows: My said son shall receive the sum of One hundred and fifty ($150.00) Dollars per week out of the said balance of income, and whatever sum remain after such payments to my residuary estate and such weekly payments to my said son, Julius Stulman, shall be turned over to him at the end of each and every year during my wife's lifetime, upon an accounting had to determine the amount of said profits; Provided, that my said son shall receive no other compensation from the said Stulman-Emrick Lumber Co., Inc. during the said period, either by way of commissions or otherwise, it being my intention that the said weekly payments and the balance of profits paid to him, as aforesaid, shall be in lieu of all other salary or compensation for his services to said corporation; provided further, that such weekly sum and the balance of said

profits as aforesaid, shall be so paid to my said son only in the event of and as long as he shall continue as an employee of Stulman-Emrick Lumber Co., Inc. during the lifetime of my said wife, Ida Stulman; and in the event that he shall withdraw from said corporation and business or terminate his employment therewith any time prior to her decease, the sums which would become due and payable to him from said business, as aforesaid, shall, from the time of his withdrawal therefrom, as aforesaid, be and become part of the income of my residuary estate, to be distributed as is hereinafter directed. I hereby direct that whatever sums be due to me from Stulman-Emrick Lumber Co., Inc. at the time of my decease, by way of dividends or otherwise, be credited to my estate at that time, and that any sums due and owing to said corporation be charged to me at that time, and the balance adjusted accordingly."

In the opinion of the court a large part of the doubts entertained by the parties respecting the proper interpretation of this item arises from a failure to appreciate the general testamentary plan which the testator envisaged. He realized that he had three sorts of assets which would be available for the benefit of the members of his family after his death; his insurance, which he erected into an *inter vivos* trust for the primary benefit of his wife; his general investments, which were erected into a separate trust with aliquot parts of its income payable to his wife and children, and his incorporated business, which is dealt with in the item under present consideration. Under his own management this business had been exceedingly profitable, its success obviously having been due to the presence of two contributing factors, namely, the capital invested therein, which was $100,000, and his personal efforts. While the latter would be removed by his death, the former would remain, or so it appeared to the testator at the time the will was executed. Two courses were open to him in respect to this capital. He could either direct the realization thereon and its investment in less speculative securities, or he could permit his estate fiduciaries to try the experiment of permitting it to remain in the business and allowing his son, who had long been associated with him therein, to try his hand at supplying the personal element which death would prevent him, individually, from continuing. If this latter course were adopted, the decedent's contribution to the success of the enterprise would be the capital of the corporation. A fair return on this sum, so invested, would amount to six per cent, or $6,000, a year. He, therefore, in effect, authorized his executors to permit his son to continue the use of the assets upon the payment of this return to the estate, further providing that all profits of the business above this quasi-rental sum should belong to the

son, and that upon the termination of the trust the son should be privileged to take his distributive share of the estate in the stock of the company at par. By this arrangement he gave the son a real opportunity to set himself up in and become the owner of a business which, under the testator's management, had been phenomenally profitable. Every addition to the original capital structure, every cent of profit made by the business other than a fair return on the invested capital, was to belong to the son. If he was made of the same stuff as his father, the remuneration for his efforts, based on the profits of the business for the two years prior to the execution of the will, would amount to over $25,000 a year after the payment of the " rental " of the estate assets, the use of which was thus allowed him.

What the testator did not contemplate was that the assets of the corporate capital might become impaired between the time of the execution of the will and the time of his death. In this he did not differ from the great mass of testators whose affairs have suffered detriment by the unprecedented conditions of the financial depression in which the world has been laboring since October of 1929. No doubt the capital has been impaired to some extent. How much this amounts to has not been demonstrated and is presumably difficult, if not impossible, of present exact determination. It seems probable, in view of the statements in the briefs of the parties that doubtful items have since been collected, that it will turn out to be for less than the thirty per cent indicated in the estimates submitted in the tax proceeding. No matter what it is, however, it is immaterial in an interpretation of the terms of the will, since it was an event which testator did not foresee and against which he did not provide.

In this connection, the court can but repeat the primary principle to which it adverted in *Matter of Shevlin* (143 Misc. 213, 214): " The problem presented in this proceeding for construction arises by reason of the occurrence of certain contingencies which the testator, at the time of the execution of his will, apparently failed to foresee and against which he certainly did not provide. There is, therefore, here no question of intent of the testator, as ' the court is powerless to construe the will on the basis of the eventualities which have actually transpired since such an act would not amount to a construction of the will which was actually made, but would be a rewriting of the instrument by the court in the manner which it might conjecture the testator would have wished, had he foreseen the actual turn of events.' "

Adverting now to the specific questions propounded respecting item " eleventh," it was the custom of testator to withdraw for

himself in one form or another, substantially the total surplus of the company in each year. A part of this was done periodically, and the balance at the end of the fiscal period. His custom was also demonstrated of postponing his " salary " withdrawals if the financial condition of the company required it. It seems obvious that his directions respecting " income, dividends and profits " contemplated the same procedure, and, in essence, provided for a monthly declaration of dividends by the corporation, if its affairs permitted of such a course. Such monthly dividends, if possible, would amount to $500 a month for the estate plus $150 per week for the son, with a cumulative preference in favor of the former. As strict matter of fact, the payments to the estate would be made in the form of dividends, whereas those to the son would be salary, but the preference given to the former would exclude any payment of the latter until the prior obligation had been solved in its entirety from the date of death. At the end of each fiscal year of the corporation, the son would be entitled to receive all additional profits made by the corporation during the period, as additional compensation, but only on the condition that the estate had received all monthly dividends of $500 each from the time of the death. On primary corporate principles, no dividend may be declared either at a time when capital is impaired or where impairment would result from the action. *A fortiori*, under the terms of the will, the son can receive none of the salary, or quasi-salary, payments during such a period, or which would produce a similar result.

The court can conceive of no theory on which these directions would not be entirely valid and binding upon all of the fiduciaries of the estate and none has been suggested by any party to this litigation.

It is the usual rule that estate fiduciaries are compensatable only by their statutory commissions (*Matter of Gorra,* 135 Misc. 93, 99; *Matter of Kahn,* 140 id. 532, 534), which are in full for all services rendered (*Matter of Anable,* 139 Misc. 914, 916; *Matter of Sharp,* 140 id. 427, 432). While it is true that extra compensation may be allowed where extraordinary services are performed quite outside the usual duties of the trust (*Lent* v. *Howard,* 89 N. Y. 169, 179; *Matter of Berri,* 130 Misc. 527, 534; see, also, *Matter of Kirkman,* 143 id. 342, 350), the court is familiar with no precedent which has permitted such recompense in contravention of the express terms of the will, which would be the case were Julius Stulman to be paid other than in the manner directed in this item.

The fiscal year of the corporation during the continuance of testator's life corresponded with the calendar year. It was his

custom to compute the profits and general status of the concern on this basis, and the court is of the opinion that the word "year" in the "eleventh" item referred to the same period in the phrase "at the end of each and every year during my wife's lifetime."

The foregoing naturally leads to the consideration of the questions concerning the powers and obligations of the trustees in respect to the retention and disposal of the capital stock of the Stulman-Emrick Lumber Co., Inc.

In the "thirteenth" item of the will the testator directed that on the death of his wife all assets of his estate be liquidated and distributed *pro rata* among his four children subject to the right of any child to receive any portion of the property in kind at a valuation to be fixed by the executors, with the further limitation that "my son Julius Stulman shall at his option be entitled to receive as part of his share all of the capital stock of Stulman-Emrick Lumber Co., Inc., at the par value thereof."

The "fifteenth" item read: "I hereby give power to my executors to continue the business of Stulman-Emrick Lumber Co., Inc., the business of Price Lumber Corporation and also the business of 18–20 Wooster Street Realty Corporation, for such a period of time as to them may seem advisable for the best interests of my estate; it being my intention and preference that the business of these three corporations shall be continued as long as good business judgment shall so dictate, and shall not be liquidated unless conditions make such step absolutely necessary, according to the best judgment of my executors. I hereby give power to my executors to continue the business of Idajo Realty Corporation as long as in their best judgment it is necessary that such business be continued; and I further empower them to discontinue said business and liquidate the assets of said corporation at any time that it may seem advisable to them to do so for the best interest of my estate."

In the "sixteenth" item he stated: "These provisions are to apply only during the lifetime of my wife, and at her death all of my business affairs and assets are to be liquidated, as previously directed."

The "seventeenth" item read in part: "I hereby direct that all moneys which may come in or accrue to my estate, by way of payments on account of principal or from the liquidation of any of my assets or properties prior to the decease of my dear wife, * * * shall be reinvested" in a manner therein particularly specified.

Under ordinary circumstances testamentary fiduciaries possess no authority of indefinite holding of investments which are not

within the description of section 111 of the Decedent Estate Law, and are, in addition, not such as ordinary reasonable and prudent men would retain. (*Matter of Herriman,* 142 Misc. 164, 165; *Matter of Blake,* 146 id. 776, 780.) The burden of proof is strictly imposed upon any fiduciary who continues non-legal investments to demonstrate the testamentary authority for such holding beyond the time necessary for prudent liquidation. (*Matter of Robbins,* 135 Misc. 220, 223; *Matter of Harbeck,* 142 id. 57, 64; *Matter of Herriman, supra.*) As this court had occasion to remark in the *Robbins* case: " * * * under ordinary circumstances, a trustee has no authority to invest trust funds in any manner other than that specified by statute, but if the tenor of the will demonstrates that testator desired to vest in the trustee a broader discretion, he will be protected so far as he strictly pursues the authority bestowed and complies with the general rules of law applicable to his office."

The question in the case at bar is really broader, however, than that of mere continuance of investment by the fiduciaries, and in essence concerns the continuance by them of the testator's business, since he was virtually its possessor by reason of almost complete stock ownership. Under such circumstances the rule of law has been inflexible for the last half century, at least, that to permit a testamentary fiduciary so to continue, a power to that effect " must be found in the direct, explicit and unequivocal language of the will or else will not be deemed to have been conferred." (*Willis* v. *Sharp,* 113 N. Y. 586, 590; *Columbus Watch Co.* v. *Hodenpyl,* 135 id. 430, 435; *Matter of Kohler,* 231 id. 353, revg. 193 App. Div. 8; *Matter of McCollum,* 80 id. 362; *Matter of Archer,* 77 Misc. 288; *Matter of Gorra,* 135 id. 93, 98.) The equitable powers of a Surrogate's Court permit it to penetrate to the inner verities of the situation. Thus where the business in question is actually within the sole control of the testator, his testamentary fiduciaries will be held to a strict accountability in this regard, whether or not the formality of incorporation has taken place. In the absence of unequivocal authority for continuance contained in the will " an executor or administrator has no authority *virtute officii* to continue it, except for the temporary purpose of converting the assets employed * * * into money." (*Willis* v. *Sharpe,* 113 N. Y. 586, 589.)

In either case the terms of an alleged authority must be construed in a manner similar to that adopted with a power of attorney, the burden being cast upon the one exercising the power to demonstrate that his acts are within the contemplation of its terms.

Adverting now to the phraseology of the " fifteenth " item of the will, the power to continue the business is limited. The executors

are authorized to adopt this course only " for such a period of time as may to them seem advisable for the best interests of my estate." Obviously, while broadly discretionary, this authority has its limits and were the fiduciaries to act in excess thereof; in other words, were they to continue the business other than for purposes of liquidation when they were satisfied that such a course was not for the best interests of the estate, they would render themselves liable if such a fact were capable of demonstration. The expressed preference of testator for the continuance of the businesses referred to, " as long as good business judgment shall so dictate," is as purely precatory as a request on his part that a named attorney should be employed to settle the affairs of his estate. Whereas a certain amount of moral obligation may rest upon the executors to follow the wish of the testator in this respect, any legal compulsion is non-existent.

To reply categorically to the several questions propounded in this connection, the executors are under no legal compulsion to hold the stock of any of these corporations until the death of Ida Stulman, and have the power to sell prior to that time, and are under an obligation so to do if a situation arises when they deem such a course for the best interests of the estate, whether or not the shares are demonstrated to be a wasting asset. On such a sale, if it is had, their obligation is to dispose of it for the best price and on the most favorable terms obtainable. (*Matter of Wander*, 141 Misc. 584, 588.) No legal compulsion rests upon them to give testator's son, Julius, a preferential right to purchase at a price and on terms as advantageous as could be obtained from an outsider, but in view of the entire tenor of the will and the obvious solicitude of the testator for the welfare of the son in connection with the business, a failure so to do would, morally speaking, appear most reprehensible.

The most important questions which remain for consideration arise from the terms of item " twelfth " of the will, which gives the remainder of the estate to the fiduciaries in trust, " during the lifetime of my wife for the uses and benefits hereinafter mentioned, to wit: The rents, income, dividends and profits thereof, including the said sum of Five Hundred ($500.00) Dollars per month to be received as income on the shares of stock in Stulman-Emrick Lumber Co., Inc., as aforesaid, and income from my stockholdings in other corporations shall be divided in eight equal parts, which shall be paid quarter annually, or at any other intervals of time that my executors may see fit, to appoint and fix in any event at least once every three months, during the lifetime of my said wife, as follows: Four of said parts shall be paid to my said wife, Ida Stulman, and

one of said parts shall be paid to each of my four children, Pearl Goldenthal, Julius Stulman, Sophia Stulman and Esther Stulman * * * provided, however, that my wife shall in no event receive a sum less than Fifteen thousand ($15,000.00) Dollars per annum during her lifetime inclusive of whatever moneys she will receive under a certain insurance trust agreement entered into between me and Chatham Phenix National Bank and Trust Company under date of June 21st, 1929; and in the event that the income hereunder shall fail to equal the sum of Fifteen thousand ($15,000.00) Dollars, inclusive of moneys payable to my wife under said insurance trust agreement, then and in that event the difference between said sum and Fifteen thousand ($15,000.00) Dollars shall be taken from the principal of my estate and given to my wife in said year, it being my intention that at no time during her lifetime shall my wife receive less than the sum of Fifteen thousand ($15,000.00) Dollars per annum under this Will and under said insurance trust agreement; provided further, that in the event of any extraordinary emergency involving the life or health of my wife, or in the event of any accident affecting her health or life, I hereby empower and authorize my executors to use their best judgment in providing every necessity and comfort for her and to apply moneys out of the principal of my estate to said purpose, if necessary."

The court is utterly unable to comprehend the difficulty which some of the parties have experienced in the interpretation of this item, since it seems entirely unambiguous. The directions are that

1. The entire residuary income, including the $500 from the lumber company, is to be divided into eight equal parts.

2. This income is to be paid over to the beneficiaries at least quarterly.

3. The widow is to receive four of these parts, and the four children one each.

These directions look to the disbursement of the entire income *as it accrues*, and are consequently wholly incompatible with an interpretation that the amounts payable to the children are contingent upon the determination which could only be made at the end of the year, that the widow's income aggregated the stipulated amount.

The testator desired, however, that his widow should have available an *annual* sum of $15,000 from all sources. He, therefore, in effect, directed that if the total of these quarterly payments, to her, plus the income from the insurance trust, should not equal $15,000, the difference should be made up to her from the principal of the trust.

There is no basis for any contention that the entire income of the trust should, under any contingency, be paid to the wife since four-eighths thereof are expressly given to the four children and this is as much theirs as is the other four-eighths the property of the widow. Were it necessary, the principle might be invoked that a clear testamentary gift will not be cut down by a subsequent gift which is not equally clear (*Matter of Rossiter*, 134 Misc. 837, 841; affd., 229 App. Div. 730; affd., 254 N. Y. 583; *Matter of Schulman*, 136 Misc. 169, 170; *Matter of Judge*, 141 id. 254, 255; *Matter of Mehler*, 143 id. 63, 67; *Matter of Grauer*, 146 id. 469), but in reality this canon of construction need not be applied since the gifts are of different things, the first of income, and second of aliquot parts of principal.

The words " year " and " annum " in this item patently refer to a period of twelve months from the date of testator's death, from which time the gift for support of his wife obviously begins. (*Matter of Wolfman*, 137 Misc. 325, 327, 328; *Matter of Jackson*, 138 id. 167, 175; *Matter of Shevlin*, 143 id. 213, 215; *Matter of Taft*, Id. 387, 391.)

Of the two remaining questions, the first to be considered relates to the rights of the son on the final distribution after the death of the life tenant and the consequent termination of the residuary trust. The " thirteenth " item directs that, upon the happening of this event, " all of the assets of the estate be liquidated and the proceeds thereof be divided into four equal shares," one of which is given to each of testator's children. This direction is subject to two expressed limitations, the first, affecting all of the distributees, to the effect that any one shall be entitled, in lieu of this distribution in cash, to receive in kind, at his election, any particular asset of the estate at a valuation to be fixed by the executors. The second proviso reads: " my son Julius Stulman shall at his option be entitled to receive as part of his share all of the capital stock of Stulman-Emrick Lumber Co., Inc., at the par value thereof."

It must be obvious that this latter limitation was inserted merely for the purpose of effectuating the intention of the testator to assure to his son, if the latter undertook the management of the business and was successful in its operation, the full benefit which would have resulted from his personal efforts. It is merely the final finishing touch to the testamentary plan already considered in connection with the directions of item " eleventh."

The entirely obvious intent of the testator was that if the stock of the lumber company was still included in the assets of the estate when the time for final distribution arrived, the son should have the option of electing to take his one-quarter distributive share in

this stock at the fixed valuation of $100 per share. If the amount to which he was entitled on distribution amounted to exactly $92,500; in other words, if the distributable estate aggregated $370,000, Julius would, at his election, be entitled to receive the lumber company stock in complete satisfaction of his distributive rights; if it was more, he would, in addition, receive one-fourth of the excess; if less he could take that proportion of the 925 shares owned by the estate which his one-fourth share bore to $92,500. The contention that he should, at such time, receive this stock, and in addition would be entitled to one-fourth of the remaining corpus of the trust, is wholly untenable. Not only would such construction be a wholly unreasonable interpretation of the language used in item " thirteenth " of the will, but it would be in contravention of the plain testamentary plan of insuring equality of benefit between testator's children. This latter result is strongly favored when there is the slightest possibility for two views, which is not the case here. (*Matter of Berbling*, 134 Misc. 730, 732; *Matter of Balsamo*, 136 id. 113, 115, 116; *Matter of Gebhardt*, 139 id. 775, 779; *Matter of Grefe*, 140 id. 134, 138; *Matter of Schrier*, 145 id. 593, 597.)

The final question relates to the obligation of the executors to collect interest on the various sums owed testator at the time of his death by the corporations in which he owned a controlling stock interest. Under ordinary circumstances it is a primary principle of corporation law that even though an individual may own all of the stock of a duly incorporated company, the latter constitutes a wholly distinct legal personality. (*Saranac & L. P. R. R. Co.* v. *Arnold*, 167 N. Y. 368, 374; *Buffalo L., T. & S. D. Co.* v. *Medina Gas & Elec. L. Co.*, 162 id. 67, 76.) Whereas the corporate entity will, at times, be disregarded, this procedure is exceedingly rare and will not be adopted unless extremely cogent equities require it. (*Matter of Richman*, 142 Misc. 103, 107, 108; *Matter of Shafran*, 143 id. 754, 759.) No reason for such a procedure has been demonstrated in the present instance; wherefore, the usual rule applies that the executors are under obligation to treat the debts owing the decedent from these corporations in the same manner as similar debts of wholly unrelated individuals or concerns.

The decision of the rights of Julius Stulman to retain remuneration paid him by Hoban-Hunter Distributing Yards, Inc., while acting as a fiduciary of the estate, is reserved, as requested, to permit the introduction of pertinent evidence in relation thereto. This question may be brought on for hearing by any interested party on five days' notice.

Proceed accordingly.